MONCURE, J.,
after stating the pleadings and proceedings in the cause, proceeded as follows:
*Before I proceed to consider this case upon its merits, I will notice some questions raised and discussed in the argument, as to the proper construction and effect of the section under which this suit was instituted.
The first of these questions strikes at the whole foundation of the suit. It is whether such a bill can be filed after the death of the supposed usurious lender. It was argued that the usury laws were highly penal, involving the entire loss of the debt, both principal and interest; that it ought not to be considered that the legislature intended to enforce that heavy forfeiture through the agenc3r of a court of chancery, invoked by the borrower or his representatives against the representatives of .the lender after his death, unless such intention plainly appears ; and that, construing the section in question in connection with other sections of the same chapter, and with the general principles of equity, it cannot be fairly inferred that such was the intention of the legislature.
The section is general in its terms, embracing all cases, whether between the original parties or their representatives; and requires no discovery of the defendant, which is made the foundation for the relief afforded by other sections of the chapter. This section was engrafted in the Code, for the first time, in the revision of 1849; and a reference to the note of the revisors appended to chapter 141, and to the cases noted in the margin of the Code opposite the tenth section of that chapter, and other cases since decided by this court, will show that its true meaning accords with its literal terms. In the case of Marks v. Morris, 2 Munf. 407, it was decided that a borrower of money at usurious interest secured by deed of trust containing a power of sale, might come into a court of equity and have the sale enjoined, until, b3r some proper proceeding to be instituted by the creditor, he should establish the validity of his *247 contract; in which case the injunction was to be dissolved, and in the contrary event perpetuated. 2 Rob. Pr. old edition, ’63-’4. The reason of this decision was, that such a borrower had no day in court, as other borrowers have; and though he had tied his own hands, yet he was considered as not a free agent, but rather as the slave of the lender, and therefore entitled to the same mode of defence and measure of relief as if the deed had not been made. Much fault was found with this decision, which was from time to time questioned, shaken, or confirmed by this court in subsequent cases (Id.), until it was at length overruled. Bank of Washington v. Arthur, &c., 3 Gratt. 173; Bell, &c. v. Calhoun, 8 Id. 22. The design of the tenth section was to adopt the principle of the case of Marks v. Morris, and give it the form and force of statutory law. It therefore applies, as the principle, of that case applied, to all cases where there is a deed of trust to secure an alleged usurious debt, whether the parties to the usurious transaction be alive or dead.
The second question is, as to the measure of relief intended to be given by this section ; whether it extends to the whole debt and interest, or only to the usurious excess. If I am right in supposing that the legislature intended to adopt the principle of Marks v. Morris, then it follows that the measure of relief extends to the whole debt and interest tainted by the usury; as it did in that case, and as necessarily resulted from fhe reason on which the case was founded. The intention would perhaps have been more plainly expressed if the section had directed the injunction to be perpetuated or dissolved, according to the result of the issue. But it is, I think, sufficiently expressed to the same effect by saying: “If the jury find the transaction usurious, then the same relief shall be given, as if the party claiming under the conveyance had resorted to the court to make his claim available,” *courts of equity, as well as courts of law, are bound bjr the statute against usury, and must both alike treat a usurious contract as null and void in any suit brought by a party to enforce such contract. It is only in a suit in equity, brought by a party to be relieved from such a contract, that the court, by applying its maxim that he who asks must do .equity, can lay upon him the terms of paying the principal and legal interest as the price of relieving him from the usurious excess; unless the case comes under the 7th section; in which case he is compelled to pay the principal only without any interest, and recovers his costs of suit. It is needless to enquire whether there may not be cases in which a party claiming under a conveyance executed to secure a usurious debt, and resorting to a court of equity to make his claim available, may be entitled to some relief, as this is not such a case. It was in reference to this difference in the measure of relief given by a court of equity, according as the usurious borrower or lender is plaintiff in the suit, that the language just quoted from the 10th section was used: which was in effect saying, that if the jury find the transaction usurious, then although the borrower is plaintiff in the suit, the same relief shall be given .him as if the lender were plaintiff seeking to make his claim available. If therefore the jury was right in this case in finding the transaction usurious, the court was right in perpetuating the injunction.
The third and only remaining question on this branch of the subject is, as to the nature of the issue and mode of trying it, and the effect of the verdict, and of the character of the proceedings in this case. An issue directed by a court of chancery in an ordinary suit refers a doubtful question of fact to the decision of a jury, to which such questions properly belong, and the object of it is to satisfy or inform the conscience of the court. It *is a mere incident to the suit, which may or may not be proper, according to the nature and state of the case. The court decides the case not upon the verdict only, but also upon the pleadings and the proofs, and may decide it even against the verdict. The issue is tried before a law court, sometimes on the law side of the court which orders it (if it has a law as well as chancery side), and sometimes before another court. The court before which it is tried decides law questions arising in the progress of the trials, signs bills of exceptions taken to its opinions, and certifies against the verdict if that is its opinion, but does not set it aside. The verdict and all the proceedings on the issue are certified by the court of law to the court of chancery; to which latter court a motion for a new trial of the issue, if desired, must be made; and that court will order it or not, as upon the whole case may seem to it to be proper, and may refuse to do so, notwithstanding any errors committed by the court of law in rejecting or admitting testimony, or instructing or refusing to instruct the jury, provided the verdict, in the opinion of the court of chancery, was unaffected by such errors.
The issue provided for by the 10th section of chapter 141 of the Code is a very different thing in its nature and effects from the issue just described. It is the sole object, and not the mere incident of the suit. It is not to inform the conscience of the court, which is bound to decree according to the verdict, unless for good cause a new trial be granted. It is to be tried in the same manner and the verdict is to have the same effect as if the suit were an action at law to recover the debt alleged to be usurious. According to the principle of Marks v. Morris, the sale under the trust deed was enjoined until the plaintiff could have an opportunity of defending himself at law in any action which might thereafter be brought against him to recover the debt or the property ^conveyed by the deed. Instead of that, the '10th section provides that the plaintiff shall at once have the opportunity of making his *248 defence, in an issue to. be tried at its bar by a jury. The statute ' seems to contemplate that all the proceeding's, including the trial of the issue, are to be. had in the chancery cause, instead of having the issue tried on the law side of “the court, and the verdict and other proceedings on the trial certified from that to the chancery side of the court, according to the formality observed in the case of an ordinary issue out of chancery. I can see no well founded objection to’ the former course, and it seems to be recommended by its simplicity and directness. The latter, however, was pursued in this case. But the difference is only in form, and the substance and effect are the same. All the proceedings were conducted before the same court, and ought to be regarded as proceedings in one' and the same suit. So regarding them, all the errors of the said court (whether on its law or chancery side), committed in the suit, are subject to the supervision and correction of this 'court. With these views I will proceed to consider the case upon its merits.
The question upon the merits, whether the bond and deed of trust in the proceedings mentioned were or were not executed upon an usurious consideration, is presented both by the exception taken by Brocken-brough’s representative^ to.the refusal of the Circuit court to give their fifth instruction, and by their exception to the refusal of the court to set aside the verdict and award a new trial. All the evidence given on the trial is set out in the first bill of exceptions, and is substantially the same with the facts certified by the court to ‘ have been proved at thé trial.
These facts, so far as they seem to be material, are in substance as follows:
Spindle was indebted to. .the guardians of William L. *Waring’s children in the sum of $10,000, payable in three equal instalments on the 1st January, 1857-’8 and ’9, with interest from 1st January, 1856. The instalment due 1st January, 1857, was not paid by Spindle when due, and judgment was obtained against him for it at the spring term 1857 of Essex Circuit court, and execution issued. Spindle, being pressed for payment of said execution, requested Mr. Garnett to enquire where the sum of $10,000 could be borrowed, which sum he desired and intended to apply to the. payment of the $10,000 due to the''Warings'as aforesaid. Garnett applied to Brockenbrough 'to know if he could lend that sum; Brockenbrough’s reply was, he had no money to lend. Garnett knew that the persons to whom Spinclle desired to pay said sum were directed by decree of the Circuit court of Essex to invest the same in stock of the state of Virginia, and .suggested to Brockenbrough that if he had such stock which he could let Spindle have, it would answer his purposes. Brockenbrough replied, if state stock would answer Spindle’s purpose, perhaps he, Brockenbrough, could accommodate, him. Nothing more passed at that time between Brockenbrough and Garnett. Garnett informed Spindle of Brockenbrough’s answer, and, at Spindle’s request, it was ascertained that the parties to whom he was indebted as aforesaid, were willing to take, state stock in lieu of money. Some time afterwards Brockenbrough was furnished by the attorney of said guardians with a statement showing in what names and proportion the stocks were to be transferred. Brockenbrough after that, applied to one of the parties to whom said stock was to be transferred, to know if he would not take guaranteed bonds of the James River and Kanawha company; but said party refused, and would take only state bonds., Some time afterwards, Brocken-brough went to the city of Richmond about the stock, and on the 3d *of August, 1857, certain state bonds, amounting in the aggregate to $11,000 principal,. bearing interest from 1st July, 1857, were transferred on the books of the second auditor, to the respective guardians of the Warings, as described and set forth in the certificate of facts. At the time of the transfer none of these bonds stood in the name of Brockenbrough on the books of the second auditor, but they stood in the name Of other persons by whom, or their attorneys in fact, the transfers were made. Afterwards, in the same month of August, 1857, the certificates of said stock were delivered by Brockenbrough or his ag*ent, by Spindle’s direction, to the said g-uardians of the Warings; and at the same time the bond and deed of trust in the proceedings mentioned, bearing date on the 15th day of June, 1857, and executed to secure the payment by Spindle to Brockenbrough of $11,000 (the par amount of the said state bonds so transferred), three years after the said date, with legal interest thereon, payable semiannually, on the first day of July and January, respectively, were delivered to Brockenbrough 'by Spindle’s agent. The cash market value of the said stock was $91 in the hundred at the 'time the Warings agreed to take it from Spindle, and was received at that price. Its par value was and is $100. Brockenbrough was a man of wealth and in the habit of lending money, and was an owner of and dealer in stocks. At the time of his death, in December, 1858, he owned stocks to the amount of $97,000, of which $36,000 were in Virginia state bonds, dated at different periods from 1837 to 1854, but held no guaranteed bonds of the James river and Kanawha company. Guaranteed bonds sold in the market, universally, for less than state bonds. On one occasion the state failed for two successive years, about 1857 and 1858, to pay interest on her stock for a period of six or eight months. At one time state bonds were worth in the market more * than par. On one occasion Brockenbrough loaned to Q. S. Earland, on terms proposed by himself, $1,500 for six months, for which interest was paid in advance, and also a premium of $45. On another occasion Brockenbrough lent the. same person $2,000 for ninety days, at legal interest, and at the maturity of the debt the latter proposéd to pay, and did pay *249 $350 of it in money, and the balance, $1,650, on a bond of a third party for $1,700 or $1,750, assigned to Brockenbrough. On many other occasions Brockenbrough had loaned said Rarland money at six per cent, per annum, and never demanded of him more than six per cent., except as aforesaid on his own proposal. On divers other occasions and to divers other persons, Brock-enbrough lent out money without exacting or receiving more than legal interest therefor.
Upon the foregoing facts the jury found the transaction between Brockenbrough and Spindle to be usurious, and the court re-' fused to set aside the verdict. The question now to be considered is, were they right in so doing?
The law against usury is a highly penal law. However small may be the amount of usurious interest contracted for, and however large the amount of money loaned, the contract is declared void, and the lender forfeits the whole amount of the debt and ■ interest; and if he actually receive the usurious interest, or any part of it, he moreover forfeits double the value of the amount loaned. That strong and clear proof should be required to convict a man of usury, and subject him to all the consequences of such conviction, is a proposition which rests on the plainest principles of law, and can require a citation of no authority for its support. It is emphatically affirmed by some of our judges in the following, among other cases; and is, I believe, denied by no judge in any case. Crenshaw’s adm’r v. Clarke, &c., 5 Leigh 65; *Grigsby v. Weaver, Id. 191; Smith v. Nicholas, &c., 8 Leigh 330. The usury ought to be proved beyond a rational doubt to the contrary. Is it so proved in this case?
The bond and deed of trust, on their face, are fair and legal, and show no usury. They provide for the payment and security of a certain sum of money, payable three years after date, with legal interest payable semi-annually. They were given for state bonds of the same amount, bearing the same interest, payable semi-annually, sold and delivered by Brockenbrough to Spindle.
It is contended in behalf of Spindle that the transaction was in fact a loan to him by Brockenbrough of $10,000 for $11,000, payable three years after date, with interest from date, payable semi-annually; and that it was put in the form of a sale of state bonds as a mere shift or device to evade the law against usury. On the other hand, it is contended in behalf of Brockenbrough that the transaction was in fact, what it purports to be inform, a sale of state bonds and not a loan of money. If the former be the true character of the transaction, then it is clearly usurious. But if the latter be its true character, then it is equally clear that it is hot usurious.
That state bonds may lawfully be sold on credit at par when they are below par in the market is admitted, and cannot be denied. Nothing is better settled, in Virginia and elsewhere, than that stock, bonds and notes may be sold, like any other property, at any price not above par which may be agreed between the parties. And sales of stock and notes on credit at par when the market price was as much as twenty per cent, below par, have been sustained as lawful by this court. West v. Belches, 5 Munf. 187; Greenhow’s adm’x v. Harris, &c., 6 Munf. 472; Selby v. Morgan, 3 Leigh 577. The cash market price of the state bonds sold in this case was nine per *cent. below par at the time of the sale. In Greenhow v. Harris, Judge Roane says: “I distinctly admit the right of a party to sell property, such as bank shares, at whatever price is agreed on. The transaction becomes usurious only when the object is to borrow money, and not to purchase stock, and the price of the stock is graduated as a device to effect the purpose; or where there is a combination between the seller of the stock on credit and the purchaser for cash.” The sale, to be valid, must of course be bona fide, and not a mere pretence to cover a usurious loan. Then, was the transaction in this case a bona fide sale of state bonds, or a disguised loan of money at usurious interest?
It was in form a sale of bonds. Why was it not so in fact? Had Brockenbrough any conceivable motive for making a loan instead of a sale? Had he not the strongest motive for making a sale instead of a loan? Such a sale was lawful. He had $36,000 in state bonds, which the law gave him a right to sell to the best advantage, and which he certainly had a right to sell on three years’ credit at par. They had been issued, every one of them, at par by the state, which was bound to pay the full amount at maturity in gold or its equivalent, and to pay legal interest thereon in the meantime semi-annually. State bonds had at one time been worth in the market more than par; and might again be worth more when or before Spindle’s bond was to become payable. Brockenbrough may have given more than par for some of the bonds held by him. There is nothing unreasonable or unfair, in appearance at least, in a sale or exchange of these bonds for the bond of an individual of like amount, payable three years after date. It may well be supposed that the market value of the former was at least equal to that of the iatter; and there is nothing in the record to show that the former would not have sold in the market *at par on a credit of three years. ‘ ‘If A holds the note of B for $100 and legal interest, and he exchange it with C for his note for the same sum and legal interest, and B and C are both solvent, the transaction in no way trenches upon the statute against usury.” So said Mr. Justice Story in delivering the opinion of the court in the Bank of the United States v. Waggener, &c., 9 Peters’ R. 378, 402. Now that is precisely this case, except that here state bonds were exchanged for the bond of an individual, which surely can *250 make no difference. By making a loan instead of a sale, Brockenbrough would not only have done an unlawful act, but incurred a forfeiture of the entire debt. It must be presumed therefore that he intended to make a sale, as he hada right to do, and did in form do, unless it be clearly proved that he intended to make a loan. Is there any such proof in this case?
The fact that Spindle owed a large debt, for part of which he was pressed by execution, and wished to obtain money to discharge the debt, and that his situation and wish were known to Brockenbrough at the time of the transaction between them, are relied on as material to prove it usurious. They tend to awaken suspicion and induce scrutiny, and lead us carefully to enquire whether the transaction was usurious. But they certainly do not prove that it was. Brockenbrough had a right to sell his state bonds to the best advantage to any person who would buy them, no matter what the situation of such person was, and no matter what disposition he intended to make of them, even though Brockenbrough were fully informed of such situation and intention ; provided the sale was not a mere device to evade the law against usury ; and of that, we have seen, there must be strong and clear proof. Not only had Brocken-brough a right to sell, but Spindle had a right to buy the bonds, and for the very purpose of raising money by selling them in the market to relieve *his necessities. They may have afforded him the very best means he could have resorted to for his relief, and may have saved his property from sacrifice at a forced sale under execution. It would be a strange state of things if he could not do for such a purpose what any unembarrassed man could certainly do for speculation merely. It may be said that this would be opening a wide door for the evasion of the usury laws. If it be clearly proved that the parties intended to make a usurious loan in the form of a sale, then of course the transaction will be illegal and void; but if it appear that a sale was really intended, then it is equally clear that the transaction is legal and valid. The difference between the two cases is, that the law allows the one and condemns the other; and though you cannot do what the law condemns, you may do what the law allows, even though the effect be precisely the same. The remarks made by some of the judges in Hawkins v. Bennet, 97 Eng. C. L. R. 507, cited by the counsel for the appellants, are here very appropriate; but I will not quote them. The law, in protecting needy men against usury, does not undertake to protect them against all improvident purchases and other acts to which they may resort for the purpose of raising mohey. It would be too great a clog on commerce and the right of alienation of property to do so, and might injure, rather than benefit, the very class which the usury laws were designed to protect. It is at least as much the policy of the law that the right of alienation- of property should be unrestrained as that usurious loans should be prevented!
Another fact relied on as material is, that the transaction was preceded by an offer to borrow money. A negotiation for a-loan of money, afterwards turned into a sale, has been generally considered an important circumstance, tending to show that the transaction was usurious. But a mere offer for a loan, though stress has *been laid upon it in some of the cases, is really of little or no importance except to excite inquiry. In this case the application for a loan was not for a moment entertained by Brockenbrough, but was promptly met by the plain and conclusive answer, “I have. no money to lend. ’ ’ ' And here the communication between the parties would have ended. But it occurred just then to Garnett that the money which Spindle owed to the guardians of the Warings had been decreed to be invested by them in state bonds; that they might be willing to receive state bonds instead of money from Spindle, and that Brockenbrough had such bonds and might be willing to let Spindle have them, or enough to answer his purposes. And accordingly Garnett suggested to Brockenbrough that if he had state stock which he could let Spindle have it would answer Spindle’s purpose: and Brocken-brough replied, if State stock would answer Spindle’s purpose, perhaps he (Brockenbrough) could accommodate him. The arrangement was afterwards made and carried into execution accordingly. It appears to have been made and carried out in good faith, and I do not see how it can be considered usurious. To constitute usury there must be a loan, but here there was no loan. The proposition for a loan" was at once rejected by Brockenbrough, and there is no reason to doubt that the rejection was in good faith. Spindle finding that he could not borrow money, but could buy state bonds, and ascertaining by inquiry of the Warings that, as the money when received had been directed by the court to be invested in state bonds, they would be willing to receive such bonds at their market value instead of money from Spindle, the latter accordingly bought the bonds of Brockenbrough, and had them transferred by him to the Warings. There was certainly no usury in the arrangement between Spindle and the Warings to pay them in state bonds at their ^market value — that is, 111,000 in bonds in discharge of a debt of $10,000 in money. Spindle being then indebted to the Warings in state bonds to the paramount of $11,000, for the purpose of fulfilling his contract, buys them of Brockenbrough for the same amount on a credit of three years. This is plainly a sale, unless there be something in the case not yet noticed to show that it was a device for a loan.
The facts that after the arrangement was made between Spindle and Brockenbrough for the sale and transfer of the bonds, but before it was exécuted, though at what pre-¶ cise.time does not appear, Brockenbrough *251 applied to one of the parties to whom the stock was to be transferred, to know if he would not take guaranteed bonds of the Janies river and Kanawha company; that said party refused and would take only state bonds; and that the guaranteed bonds sold in the market universally for less than state bonds, are also relied on as material. I cannot see that they are of any importance. Brockenbrough having made an arrangement with Spindle to transfer to the War-ings 511,000 in state bonds, and supposing that as they were to stand as a permanent investment for the benefit of infant heirs, guaranteed bonds might suit as well as state bonds, accordingly made an inquiry to that effect; but when told that state bonds only would be received, he proceeded to discharge his obligation by the transfer of state bonds. Whether his idea was to transfer guaranteed bonds, as of their market value, or as of the same market value with state bonds, we are not informed. Nor is it material. Nor is it material whether Brocken-brough had any guaranteed bonds or not at the time he made the inquiry. He might have had some at that time, though he had none at the time of his death.
Another fact relied on as material is, that the bond and deed of trust bear date on the loth day of June, from *which day the bond bears interest, while the state bonds bear interest from the 1st day of July following. This discrepancy is, I think, susceptible of easy explanation. The arrangement having been made, was no doubt intended to be carried into effect at the earliest convenience of the parties. Spindle wishing to be ready on his part, prepared and executed the bond and deed of trust on the 15th of June, and the latter was acknowledged by himself and wife, and certified for record by justices a few days thereafter. Brockenbrough did not complete the execution of the arrangement on his part until early in August thereafter, though the state bonds he transferred bore interest from the 1st of July preceding, just fifteen days after the day from which the bond on its face bore interest. It is impossible to suppose that the parties intended that one should bear interest before the other. This little matter was no doubt intended to be and probably has been adjusted between them. It might be adjusted by a simple endorsement on the bond, such as was made under similar circumstances in the Bank of the United States v. Waggener, &c., 9 Peter’s R. 376. The bond was delivered in August, from which time only it was a complete obligation ; and as interest, by the terms of it, was payable semi-annually on the 1st of July and January, as on the state bonds, the first half year’s interest run from the 1st of July preceding, as in the case of the state bonds. No objection of this kind was taken on the trial, when it might have been explained. It ought not to be entertained now. To say the most of the matter it is a mere mistake or oversight, which can never constitute usur3'. To have that effect it must clearly appear that the act was knowingly and wil-fully done.
The only remaining fact which can be of any importance in showing that the transaction was usurious is, that the state bonds transferred by Brockenbrough to the *Warings, stood on the books of the second auditor in the names of other persons than Brockenbrough at the time of the transfer; thus showing, or tending to show, that these bonds were purchased by Brockenbrough at the time and for the purpose of being transferred to the Warings. My first impression during the argument was, that this was a material fact in favor of the appellees, but their counsel attached little or no importance to it, and I am now satisfied that it is wholly unimportant. Brockenbrough at the time of the contract of sale held state bonds to the amount of $36,000, and there is no good reason to believe that he did not intend to sell a portion of those bonds. It is probable that he did, as he then said he had no money to lend, and he expected no doubt to have to transfer the bonds very soon thereafter, when he might still have no money. The date of the contract does not appear. The bond and deed of trust of Spindle bear date the 15th of June, 1857, and the state bonds were not transferred till the 3d of August. By that time Brockenbrough may have received funds and had them in hand for investment. He had no doubt received his July interest on his stocks, which amounted to a large sum. Having an investment to make, it would be convenient to have the bonds purchased by him at that time transferred directly to the Warings, instead of bonds already standing in his name. This is a reasonable solution of the matter. It may be, however, though not probably, that these bonds, though standing in the name of others, were in fact his bonds at the time of the contract with Spindle. But however these things may be, it was admitted in the argument, and indeed has been admitted or decided by this court, that there may be a valid sale of stock at par when the market price is below par, though the vendor has no such stock at the time of the sale, or not enough to fulfill his contract, and has to go into the market and buy it for the purpose. *Greenhow’s adm’x v. Harris, &c., 6 Munf. 472; Selby v. Morgan, 3 Leigh 577.
It would be impossible to reconcile all the cases which have been decided in England and in this country on the subject of usury; and I will not be so rash as to attempt it. Nor will I comment upon the many cases which were cited by the learned counsel who argued this cause. There is one case, however, decided by our own court, which is, I think, conclusive of this, and which, therefore, I will especially notice. I mean the case of Selby v. Morgan, 3 Leigh 577. The marginal abstract of that case is this: “S., being under an urgent necessity to raise a sum of money, requests M. to assist his agent in negotiating a loan thereof at bank: M. lends his assistance, but the bank *252 refuses to lend the money; then M. proposes to S. to sell him bank stock at par upon a credit, the stock being' then twenty per cent, below par in the market; and M. enters into a negotiation with the bank to borrow the money S. wanted for S. upon a pledge of the stock; the bank offers to lend the money upon a pledge of the stock and S.’s note endorsed by M. ; and M. having thus settled the terms of the loan with the bank, sells his stock to S. at par on a credit, and, immediately, the bank lends S. a sum equal to four-fifths of the par value of the stock, on a pledge of the stock, and on S.’s note endorsed by M. Held, this is ,a fair sale of bank stock by M. to S., and not a device to cover an usurious loan of money.” The case was earnestly argued by very able counsel, and was unanimously decided by the court, consisting of Judges Carr, Cabell and Brooke; President Tucker having decided the same case in the same way in the court below. The decision of this court was in 1832, and has never since been overruled, or, so far as I have seen, been questioned by any judge in any case. It is therefore a binding authority and must govern this case unless materially *distinguishable from it. It seems to me that in every material feature, that case has more the marks of a loan than this; if this can be said to have any. I refer to the facts of that case as set out in the report and to the opinion of Judge Carr, without quoting from them. It was argued in this case that in that the bank stock was bought to be used as a pledge for raising money and not to be sold, and was in fact so used. It was bought to be used by the purchaser according to his pleasure, and as might best serve his purpose of raising money. He was informed by the seller that it would serve his purpose, either by a pledge or a sale, though the former was recommended as preferable. But it can surely make no difference what the purchaser did with the stock. It was further argued that no application was made by S. to M. for a loan in that case, as was made by Spindle to Brock-enbrough in this. But in that case S. had been trying in vain, through the agency of M. to borrow money from the banks to relieve his pressing necessities, when M. in communicating the failure of his efforts to S., proposed, as a measure of relief, to sell him bank stock at par, which was selling in the market at twenty per cent, discount. In this case Brockenbrough was not the agent of Spindle; rejected promptly the application of Spindle through Garnett for a loan; made no proposition at all for the sale of state bonds or otherwise, and only assented to a proposition of Garnett for such a sale for the accommodation of Spindle. There is a manifest difference between the two cases in this respect, but the difference is certainly and decidedly in favor of Brock-enbrough in this case. •
It was argued that the question of usurious intent in cases of this kind is a question of fact for the jury, and not a question of law for the court; and that the jury in this case having decided the transaction to be usurious, their verdict ought not to be set aside even by the Circuit *court, and still less by this court; at least unless it was plainly wrong. The law which authorizes the proceeding in this case expressly provides that the court may grant new trials, as in other cases. The question of usury is a question both of law and fact. There cannot be usury without facts; and those facts, when they are controverted, must be tried and ascertained by the jury. Whether upon those facts the transaction be usurious, is a question of law which addresses itself alone to the court. It is argued that intention, or the “corrupt intent” as it is called, is a necessary element in the constitution of usury, and is a question which peculiarly belongs to the jury. But a man may be guilty of usury without actually intending it. The case of Marsh v. Martindale, 3 Bos. & Pul. 158, was a case of that kind. There the jury, in a special verdict, expressly found that Marsh did not think he was acting contrary to law, and yet the court decided that upon the facts found he was guilty of usury. A man must knowingly and intentionally commit the acts which constitute the usury, but the law presumes that he intended the necessary consequence of those acts, and presumes, even in opposition to the fact, that he knew those acts were usurious and unlawful. I will not review all the cases on this subject which were cited in the argument, but will notice only two which were decided by this court and settle the law beyond controversy. One of these is Gibson v. Fristoe, 1 Call 54, 63; in which the jury found a special verdict without finding a corrupt intent, an yet the transaction was held by this court to be in law usurious. The other is the case of Stribbling v. The Bank of the Valley, 5 Rand. 132. There the jury found a general verdict for the plaintiff, which the court below refused to set aside. This court reversed the judgment. In regard to an instruction asked for by the defendant, which, like the fifth instruction asked for here, *set out the whole evidence. Jugde Carr said: “The court refused the instruction, either on the ground that the question, whether the facts amounted to usury, belonged exclusively to the jury, or that the facts as stated did not amount to usury, and therefore did not justify a verdict for the defendant. Upon either hypothesis I think the court was wrong:” and he then proceeds to review the cases. He thought the court erred in refusing to give the instruction, and also in refusing to grant a new trial; the verdict being against law and evidence. Judge Green agreed ■ with him on both of these points. Judge Cabell, the remaining judge wJ-io concurred in the decision, said nothing about the verdict, but was for reversing the judgment on the ground that the court erred in not giving the instruction'. “It is contended,” he said, “that the court could not give the second instruction asked for without invading the province of the jury. I *253 admit that it is the exclusive province of the jury to determine disputed facts. But when the facts of a case shall be ascertained by a special verdict, or shall be admitted by the pleadings, it is the province of the court to state the law arising upon those facts; and in all such cases the question, whether the facts constitute a sale or loan, or whether they constitute usury or not, is a question of law which the court must decide. ” “But the most usual mode of obtaining the opinion of the court on points of law, is for the party desiring it to move the court to instruct the jury. All that is necessary for this purpose is, for him to state his case hypothetically, and if it be pertinent to the cause, the court is bound to pronounce the law on the case thus stated.” After this decision, which still remains in full force, there can be no doubt on the subject in this state. It is therefore a question of law for this court to decide, whether upon the evidence, as set out in the instruction, supposing it to be true, and ^whether upon the facts set out in the certificate of the court below, which are substantially the same, the transaction is usurious or not; and, if of opinion that it is not, it is the duty of the court to reverse the judgment, set aside the verdict, and award a new trial.
My opinion on this question has been already too plainly expressed to require repetition. The transaction on its face is a sale of state bonds at par for a sum of money payable at a distant day, with legal interest from the date, payable semi-annually. If it be in fact what it purports to be, it is a valid and legal transaction. None of the facts set out in the certificate are at all inconsistent with a bona fide sale of state bonds, or such as would not naturally occur, or might not even be expected to occur, supposing the sale to have been bona fide. To justify the verdict, usury ought to have been proved, as I have before said, beyond a rational doubt to the contrary. Instead of that, the facts certified by the court do not raise a well-founded suspicion of guilt. We cannot say of this case as Judge Roane said of Greenhow’s adm'x v. Harris, 6 Munf. 472, “that it is possible and even probable that these transactions were founded in usurious views on the part of all the parties,” and yet he could “not say so upon the record,” but concurred with his brethren in deciding that the said transactions were not usurious. The jury must have found their verdict in this case either on mere suspicion and conjecture, unwarranted by the facts proved, or upon a misapprehension of the law ; and in either case the verdict is against law, and ought to have been set aside. I think the court below erred, first, in refusing to give the fifth instruction moved for by the appel-ants; and secondly, in overruling their motion to set aside the verdict and award a new trial. Therefore (without expressing any opinion in regard to the other instructions refused to be *given), I am for reversing the decree, setting aside the verdict, and remanding the cause to the Circuit court for a new trial of the issue to be had therein, on which new trial, should the evidence be the same, substantially, as on the former trial, the court (if requested by the appellants) is to instruct the jury that if they believe the facts to be according to the said evidence, they ought to find the transaction not to be usurious.
JOYNRS, J., concurred in the opinion of Moncure, P.
Decree reversed, and new trial directed.