Moncure, P.,
delivered the opinion of the court.
The first question which this case presents for our decision is, whether the decree of the Circuit court of Fauquier county, made on the 13th day of September 1867, has ever been reversed or annulled by any valid proceeding, and does not therefore still remain in full force ?
In the first place, it is contended that after the date of the said final decree, and after the act of March 15th, 1867, reducing the period of limitation of appeals to two years, there elapsed two years before the record was delivered to the clerk of the appellate ■court, and before process issued upon the appeal, and before such bond was given as was required to be given before the appeal could take effect. The date of the order made by W. Willoughby, as a judge of the *42 late district Court of Appeals, held at Fredericksburg,, allowing an appeal from the said decree to the said district court, was May 17th, 1869, much less than two-years after the date of said decree. Process was issued upon the appeal on the 13th day of September 1869,. exactly two years after the date of said decree. The appeal bond, however, was not given until the 11th day of November 1869, more than two years after the date of said decree.
To this objection the answer made by the counsel of the appellee is sufficient; that the act of March 15th, 1867, which amended the third section of chapter 182 of the Code of 1860, changing the limitation of time for presenting a petition for an appeal from, or writ of error or supersedeas to any final judgment decree or order, from five years to two years after it was rendered or made, did not amend the twenty-sixth section of that chapter, which allowed five years within which to perfect the appeal by giving bond, &c.; and this stood unaltered until it was amended by act of' June 23, 1870 (Acts of 1869-’70, p. 224, § 17); so that the petition was presented, and all other acts performed within the time allowed by law. But see Callaway v. Harding, 23 Gratt. 542, which will suffice.
If, however, the appeal had not been perfected within the period limited by law; still, as no objection was made on that ground until after the judgment was. affirmed by the appellate court, it was certainly too late to make the objection then for the first time.
In the next place, it is contended that even supposing the appeal which was allowed, to have been perfected in due time, yet the appeal was invalid; and therefore the decree of the appellate court founded, thereon, is also invalid, and the said decree of the Circuit court still remains in full force.
*43 It is contended that the appeal was invalid, because W. Willoughby, by whom the same was allowed, as a judge of the late distinct Court of Appeals, held at Fredericksburg, was not in law or in fact such judge, and therefore had no authority to allow an appeal in the case.
If it be conceded that this would have been a good objection if made in due time, it might well be argued, as indeed was argued by the counsel for the appellee, that the objection came too late. It was not made in the district Court of Appeals, while the case was pending there, nor in this court, while the case was pending here, nor in the special Court of Appeals, while the case was pending there, until after that court had reversed the judgment of the Circuit court, and then it was made for the first time.
But without deciding that question (because unnecessary to do so), we are of opinion that the said appeal was a valid appeal, according to the law of this state, as it has been settled by this court in the cases of Griffin’s ex’or v. Cunningham, 20 Gratt. 31, and Quinn &c. v. The Commonwealth, Id. 138. To that extent the judges were unanimous, although they differed upon an important question arising in the first named case. All of the five judges were presantwhen that case was argued and decided, and it was argued with great ability, and very deliberately considered and decided. We all still think that that decision was right, to the extent to which the whole court was then agreed, and we are of opinion that it ought not now to be disturbed, We therefore confirm it. In Teel &c. v. Yancey &c., 23 Gratt. 691, it was held that the act of March 5th, 1870, commonly called the enabling act, is a valid act, except the proviso, which authorizes the Court of Appeals to review the decisions of the Court of Appeals- *44 organized under the reconstruction acts; and the district courts of appeal, sitting in December 1869, had jurisdiction to hear and decide the causes then pending therein. Judge Christian in his opinion in that case, after referring to the decision of this court in Griffin’s ex’or v. Cunningham, supra, said: “ The question raised is therefore res adjudicata, and no longer open for discussion.” Two of the other judges, Moncure and Staples, concurred in that opinion; and though the other two, Anderson and Bouldin, dissented, it does not appear that their dissent was to that part of the opinion.
In the next place, it is contended that even if there was a valid appeal from the said decree of the Circuit court of Fauquier county, that appeal has never been lawfully disposed of, but is yet pending in this court.
If it has been lawfully disposed of at all, it has been so disposed of by the late special Court of Appeals in reviewing the said decree of the Circuit court.
But it is contended that the decree of reversal of the Circuit court is invalid: 1st, because the special court was not organized according to the constitution of the state; and if it was, 2dly, because the case was not legally transferred from this court to the special court, to be disposed of by the latter. And,
1st. Was the special court organized according to the constitution ?
It is said that it was not, because it was made by law to consist of not more than three judges; whereas, by the constitution, it is required to consist of not less than three nor more than five judges.
Certainly, if the constitution requires it to consist of not less than three nor more than five judges, the law which made it consist of not more than three was unconstitutional. And certainly also we may say it was competent for the convention in framing the constitu *45 tion to authorize the legislature to create a special Court of Appeals, to consist of not more than three judges. The question is, “Does the constitution confer such authority on the legislature? If it does, it is an immaterial question whether a court of five would not have been better than a court of three judges; and whether it would not have been a sounder exercise of discretion in the legislature, in carrying out the provision of the constitution on this subject, to have adopted the former instead of the latter number. We were decidedly of opinion that it would have been. But that is a question not for us but for the legislature to decide, supposing the constitutional authority to exist.
How the constitution seems to speak a plain language on the subject. “Special courts of appeals, to consist of not less than three nor more than five judges, may be formed of the judges of the Supreme Court of Appeals and of the Circuit courts, or any of them, to try any cases on the docket of said court, in respect to which a majority of the judges thereof may be so situated as to make it improper for them to sit on the hearing of the same; and also to try any cases on the said docket which cannot be otherwise disposed of with convenient dispatch.” A choice of the number of the judges of a special Court of Appeals was here plainly given by the constitution to the legislature, so that such number should be between the extreme limits of three and five inclusive. If there were any doubt about this upon section 3 of article vi. of the constitution just quoted, taken by itself, there can surely be none when we take it in connection with section two of the same article. “The Supreme Court of Appeals shall consist of five judges, any three of whom may hold a court.” If the convention had in *46 tended that special courts of appeals should consist necessarily of the same number of judges, required by - section two to constitute the Supreme Court of Appeals, it would, in the immediately succeeding section three have used similar language to that which was used in section two, and have said: “Special courts of appeals, to consist of five judges, any three of whom may hold a court, may be formed,” &e. But the convention thought proper to give the legislature a discretion in regard to the number of the judges of which a special court may consist between the limits of five and three, believing no doubt that while five might be a preferable number in some cases, three might be in others. The Supreme Court of Appeals of the state has sometimes consisted of but three judges. It so consisted at one time before the state was divided as it now is. And it so consisted for several years under the Alexandria constitution, after the state was divided. The first term of the court under that constitution was held by only two judges, during the sickness and after the death of Judge Thompson, and before the appointment and qualification of his successor, Judge Hives. That court of two judges went on to hear and decide the cases as they stood upon the docket, without any objection so far as heard of from any quarter. It decided some very important cases. Among them was that of Brockenbrough’s ex’ors v. Spindle’s adm’ors, 17 Gratt. 21, which was argued for the appellants by two of the same counsel, who argued this cause for the appellant, and, as the reporter truly says, they argued it “most ably.” They gained that cause, the decree of the court below having been reversed. With this example immediately before the eyes of the convention, when it framed the constitution, it may well have been led to suppose that three judges might be a sufficient number *47 to compose a special Court of Appeals, which would be required only occasionally, and perhaps for short periods. And economy, which was then a very important consideration, strongly recommended that the court should consist of three rather than five judges. At all events, it no doubt seemed to the convention to be reasonable to give to the legislature an election between the numbers three and five in the constitution of the court.
The legislature so construed the constitution, and accordingly passed the act approved February 28, 1872, entitled “an act to provide a special Court of Appeals.” Acts of 1871-72, p. 98, chap. 124. That act unmistakably creates a court to consist of three judges, and not more, and no person ever doubted, so far as we know, that the act was constitutional, until it was recently doubted by counsel in this case. Nothing is better settled than that, prima facie, every act of the legislature is constitutional, and the burden of clearly showing the contrary devolves on him who asserts it. If the question be doubtful, it will be solved in favor of the validity of the act. If this act be not plainly in accordance with the constitution, it certainly cannot be said that the contrary plainly appears.
We do not see the force of the objection to the constitutionality of the act, arising from the provision in section 2 of article vi. of the constitution, concerning the Supreme Court of Appeals, which declares “that the assent of the majority of the judges elected to the court shall be required in order to declare any law null and void by reason of its repugnance to the Federal constitution or to the “ constitution of this state.” It was not contemplated nor intended that cases involving a question of constitutionality of a law should be referred for decision to a special Court of Appeals, *48 which must consist in part at least, and may eonsistentirely, as in the instance of the special court in question, of Circuit court judges. In certifying cases to-the special court for decision, of course the Supreme-court would certify none which was known to involve a constitutional question: and if a mistake should happen to be made in that respect, it could easily be corrected by returning the case to the Supreme court, or leaving it for decision by that court. A similar course, it is believed, was pursued whenever it was deemed proper, even before the passage of the act approved. January 17, 1878. Acts of 1872-’73, p. 26, chap. 39..
Hor do we see the force of the objection made to the constitutionality of the act, upon the ground that, it authorized the Court of Appeals to designate annually three judges of the Circuit courts, to constitute-a special Court of Appeals. We do not consider this as a legislative power, which the Court of Appeals had no constitutional power to perform. . This was, no doubt, deemed by the legislature to be the best and most convenient mode of mere designation of three of the circuit judges to hold the special Court of Appeals. A similar mode has been authorized by law to be pursued in other like cases, without objection. In the act providing for special Courts of Appeals, passed March 15th, 1832, Sup. to R. C. p. 123, chap. 95, the duty of designating the judges to constitute a special Court of Appeals was devolved on the General court. Certainly the General court had no more capacity to perform such a function than had the Court of Appeals. In the act passed February 25, 1854, Acts of 1853-4, p. 18, ch. 17, sec. 5, power was given to the Court of Appeals to designate judges of the Circuit courts to hold a special Court of Appeals ; precisely such a power as was conferred by the act of 1872.
*49 Then the special Court of Appeals, created by that act, was organized according to the constitution; and we proceed now to enquire,
2ndly. Was this case legally transferred from this court to the said special court, to be disposed of by that court ?
Under this head we understand two objections to be made; first, that this is not such a case as ought to have been transferred to the special court; and, secondly, that no opportunity was afforded the appellant to object to such transfer, or show cause against it. We now proceed to consider these two objections; and,
[First, that this is not such a ease as ought to have been transferred to the special court.
To determine this question, we must look at the words of the first section of the act, and of the third section of the sixth article of the constitution; and we need only look to a few of those words. By the first section of the act, the special court is constituted for the trial of such causes “as the Court of Appeals cannot dispose of with convenient dispatch, and shall certify to it, as provided in article sixth, section three, of the constitution of the state, not exceeding fifty at a time.” And by the third section of the sixth article of the constitution, special courts are authorized to be formed “ to try any cases on the docket of the Supreme Court of Appeals, which cannot be otherwise disposed of with convenient dispatch.” This is all that is said, either in the constitution or the act, in regard to the nature of the cases to be tried by the special court, in the exercise of the branch of its jurisdiction we are now considering.
The only limitation, if limitation that can be called, upon the cases on the docket which the special court *50 is authorized to try, is contained in the words, “ which cannot be otherwise disposed of with convenient dis- - patch.” Now what cases are they? Are they the first cases, or the last cases on the docket? Or those in the middle f The first have been longest pending, and in reason, it would seem, ought first to be tried. The last will not be tried for the longest time, and for that reason may seem to be those for the more speedy trial of which provision should be made. The cases in the middle of the docket, having been longer pending than the last, and not s.o long as the first, may, on that account, be considered as entitled to preference in the transfers to be made to the special court. These words, “convenient dispatch,” are very indefinite words, and they are relative words. What would be convenient dispatch in regard to one case would not be convenient dispatch in regard to another, although both might be disposed of in the same time. Take a case, for example, that has been pending two years, and another that has been pending two months. To dispose of the latter in one year, might be convenient dispatch; whereas, to dispose of the former in one year, certainly would not be. Who is to decide these questions? To whom did the legislature and the framers of the constitution refer them? To whom else than this court, which was reasonably supposed to have more information on the subject, and to be better able to judge correctly in the matter than any other person? This court did exercise its best judgment in the matter under all the circumstances.
The act provided that it should continue in force for two years, unless this court should enter an order of record that the existence of said special court was no longer necessary. Thus showing that during that period of two years it was expected that all the cases on *51 the docket which were necessary to be tried by a special court could be tried, and there would then be no longer occasion for such a court. If, however, there should be such occasion, the members of this court, and all other persons concerned, confidently expected that the special court would be continued until all occasion for it ceased. Thus it was confidently expected that this constitutional plan of reducing the overloaded docket of this court, by the assistance of a special court, would be actively and continuously pursued until the end in view was accomplished, which it was expected would be the case in two or three years, when it was hoped that this court would be able to keep down its docket for the future. Under these circumstances, it became our duty to execute the power conferred on us bjr the first section of the act of February 28, 1872, aforesaid, to certify for trial by the special court, such causes on the docket of this court as could not be disposed of by this court with convenient dispatch. We had much difficulty in regard to the cases proper to be certified to the special court. We at length concluded that the fairest and best mode was to certify to it, the first fifty unargued causes standing on the docket at the time of our adjournment in Richmond in the spring of 1872. The special court was to sit on or about the first of July thereafter. We were not again to sit in Richmond until some time in November, and would then be for some time occupied in the trial of criminal and other privileged causes, so that it might be sometime in January before we could resume the trial of causes on the regular docket. During all this time the fifty oldest causes on the docket, which had already been delayed more than two years, would have been delayed many months longer but for our transferring them for trial to the special court. *52 Whereas by so transferring them, and by pursuing the same course thereafter, it was reasonably hoped that if • the special court should be continued so long as might be necessary, as was then expected, all the causes on the docket would be disposed of with as convenient dispatch as would be consistent with the rights of all parties concerned. We may have come to a wrong conclusion, but we acted according to the best of our judgment, and even if we made a mistake, it certainly cannot be such an error as invalidates the judgment of' the special court. And now let us consider the objection. Secondly, that no opportunity was afforded the appellant to object to such transfer, or show cause against it.
The act of assembly made no provision for affording such an opportunity. It only provided for the. transfer to the special court, of such causes as this court could not dispose of with convenient dispatch, not exceeding fifty at a time. There could be no occasion for such an opportunity in regard to the question of convenient dispatch with which a cause might be disposed of. That was a question which the court could decide without the aid of parties or their counsel. It could not have been contemplated by the framers, either of the constitution or the law, that all or any of the suitors in the court might raise an issue on that question. There might be peculiar reasons for not certifying a particular case to the special court; such as the fact, that a constitutional question existed in the case, or the fact that one of the “judges of the special court decided the case as a circuit judge. But such facts, which would be cases of rare exception, might be brought to the notice of either court at any time, and the case, whenever proper, would be restored to the docket of this court. If there was any advantage to be derived from *53 a trial of a case in one of the two courts, rather than the other, the suitors in this court were all equally entitled to the benefit of that advantage. The impor- - -tance of a cause afforded no sufficient reason for excluding it from the special court. That court was not instituted for the trial of inferior causes, but all causes ■on the docket, important or unimportant, which could not otherwise be disposed of with convenient dispatch. To be sure the special court consisted of but three members, while this court consists of five, which may be supposed to give to those, whose causes are tried in this court, an advantage over those whose causes were tried in the special court: but that was an accidental advantage, if any, which all had an equal chance to obtain. In consequence of that supposed advantage, we would have preferred that the special court should also have consisted of five judges; but the legislature, to whom alone the decision of the question belonged, ordained otherwise. But this court is often held by only three judges, two of whom may decide the most important cause; and thus it may happen that the judgment therein may be reversed by two judges against two. That the appeal was taken to a court consisting of five judges, is no sufficient reason for the case not being tried by a court which happens to be held by only three of the five judges. These are accidents to which all suitors are subject. We have seen that by changes in the constitution and laws of the state the number of the judges of this court has been sometimes five and sometimes three. And of whatever number the court happens to consist, it goes on to try the causes as they are called, without regard to the state of the court when the appeal was taken* Thus it has sometimes happened that an appeal taken to a court of three judges has been tried by a court of *54 five; and so vice versa. After the close of the war, it happened that there was an overwhelming accumulation of business in this court. The evil was so great, that all concerned were anxious to devise an adequate remedy for its removal. And the act of February 28, 1872, to provide a special Court of Appeals, was passed for that purpose. The preamble of that act gives us some idea of the nature and extent of the evil. “Whereas it appears,” says the preamble, “that the business of the Court of Appeals has increased so much by reason of the numerous questions to which the war has given rise, that the causes upon its docket cannot be conveniently tried within a reasonable time,” &c. This act is very different from the act of March 81, 1848 (Acts of 1847-’8, p. 51, chap. 68), to which the learned counsel of the appellant seems to suppose it to be analogous. And we therefore think there was no occasion for using the same precautions in the act of' 1872, as were used in the act of 1848. That act was passed under a constitution which made no provision for a special Court of Appeals, but which, on the contrary, declared that “ the judicial power shall be vested in a Supreme Court of Appeals, in such superior courts as the legislature may from time to time ordain and establish, and the judges thereof, in the County courts, and in justices of the peace.” It was argued that under that constitution there could not be two Courts of Appeals. And in the preparation by the learned revisors of the Code, of the act of 1848, they had to use their skill to avoid leaving any room for reasonable objection to the act. And, notwithstanding that, a great controversy arose in regard to the act, which was settled in this court in the case of Sharpe v. Robertson, 5 Gratt. 518-644. In the constitution adopted since that decision was made, the precaution has been *55 used of avoiding a like difficulty, by expressly providing for the creation of a special Court of Appeals: as in the constitution of 1851, the Alexandria constitution, and the present constitution. In the constitution of 1851, provision was made for the trial of all the causes on the docket of this court when that constitution took effect. So that it was plain what causes were to be tried by a special court under that constitution, and easy provision was made therefor by the act passed February 25th, 1854 (Acts of 1858-4, p. 18, chap. 17), leaving this court to try the new causes after-wards brought to it. In the Alexandria constitution provision was made similar to, but not the same with that contained in the present constitution. "We have seen what that is. The act which was passed to carry that provision into effect was not like the act of 1848, because the constitution under which it was enacted was very unlike the constitution under which the act of 1848 was passed. And if the act of 1872 was constitutional, as we think it was, of course the legislature had a right to pass it, and it is valid, although it does not contain the provisions of the act of 1848, however wise those provisions may be.
It follows, from what we have said, that the decree of the 27th of January 1873 is a valid and conclusive decree; that there can be no complaint of any error either in it or behind it; and that if there be any error in this case, for which relief can be afforded, it must be in the proceedings which occurred in the case after it was remanded by the special Court of Appeals to the Circuit court. The appellant complains of such errors, and we now proceed to consider that complaint.
Among the errors complained of in these subsequent proceedings, are several which involve the same questions we have already considered and decided, and it *56 will therefore be unnecessary to do more than to state them. That the decree of the special Court of Appeals is a valid and conclusive decree, as far as it goes in the case, is an answer to them all. The first of them is, that the Circuit court on the 17th day of April 1873 ordered the decree of the special Court of Appeals of the 27th day of January 1873 in the case, to be entered as the decree of the said Circuit court, notwithstanding the resistance of such entry by the appellant, who insisted that the said decree of the special court was null and void for the reasons and upon the grounds set forth in his written objections filed, and ordered to be made a part of the record in the cause. The second of them is, that the Circuit court on the 17th day of December 1873 rejected the prayer of the appellant’s petition for a rehearing of the decree of said court of the 17th of April 1873, directing the decree of the special Court of Appeals of the 27th of January 1873 to be entered as the decree of the said Circuit court as aforesaid.^
When the decree of the special court was entered as the decree of the Circuit court as aforesaid, to wit: on the 17th of April 1873 the latter court, in conformity with the requirements of the said decree of the former-court, decreed that one of the master commissioners of the court should take an account, crediting the said Bobert B. Bolling with the amount paid by him on the bills held by Caldwell, Shannon & Co., and charging him with the rents and profits of Bollingbrook, and Ben Lomond from the 2d day of May 1866, when possession thereof ought to have been delivered under the terms of the contract of sale in the bill and proceedings mentioned; and also with the value of the personal property which then ought to have been delivered under the terms of the said contract; in *57 taking which said account, said commissioner was directed to make all necessary enquiries, and to report his proceedings to the court.
On the 28th of November 1878, the report of the commissioner and papers accompanying the same were filed in the cause. It contained a statement of the account between Bolling and Lersner, as directed in said decree. . “The only fact in the account,” said the commissioner, “about which there was any difficulty was the question of the proper rent to be charged for said two tracts of land. There were seven depositions taken by each of the parties relative to this question; of course these fourteen witnesses differ as to the proper amount that should be charged, or as to what said farms should have rented for; the difference between the estimates of the highest and lowest being as much as that of $1,300. With this conflicting evidence, your commissioner took the mean rent of all these estimates, to-wit, $1,925 per annum for both farms; and what is a little remarkable, the average rent of the two lowest and the two highest is within a few dollars of this sum fixed upon by your commissioner. The said Bolling was credited with all sums paid for taxes, and for ditching and stone fencing; these items were given in the exhibit filed with Townshend S. Bolling’s deposition.” Then follows the account, showing the total amount due by Bolling to Lersner, on rent account, up to 2d May 1873, with interest to 2d December 1873, to be $10,954.17, of which the sum of $9,160.83 is principal.
To this report eight exceptions were taken by Bolling and none by Lersner; and on the 20th of December 1873 the cause came on again to be heard on the papers formerly read, the said report of the commissioner, and exhibits returned therewith, and exceptions *58 taken thereto, and was argued by counsel; on consideration whereof the court overruled the first, third, -sixth and seventh of said exceptions; and being of' opinion, upon the matters contained in the fourth and fifth of said exceptions, that there is no error in said, report, in failing to give the defendant credit directly for any increase in the intrinsic value of the lands,, and that the true standard by which the rents and profits of the land should be determined is the annual value of said lands in the hands of a prudent and discreet tenant, upon a judicious system of husbandry; but being further of opinion that the mode of treatment by the occupant should have some influence in determining this value, and that the amount allowed by said commissioner is more than a fair rent under the circumstances, which the court ascertains, upon a fair view of the testimony, to be the sum of fifteen hundred dollars per annum, did overrule said fourth and fifth exceptions, in so far as they are inconsistent with the principles above declared, and did sustain them, in so far-as they are consistent therewith. And the court sustained the eighth exception, and recommitted the report to the commissioner with instructions to reform the same according to the principles of the said decree, and report the same forthwith to the court.
On the 28d of December 1873, a report of the commissioner, made in pursuance of the said decree, was filed in the cause, showing the balance due by Bolling to Lersner, as of the 20th of December, 1873, to be $5,262.43, of which the sum of $4,684.19 is principal.
To this report six exceptions were taken by Bolling- and none by Lersner. The said exceptions are as follows:
1. Because the commissioner charges the defendant with estimated and conjectural rent, &c., instead of the actual profits realized by defendant.
*59 2. Because the commissioner has failed to give Bolling credit for the increased value of the land, arising from the mode in which he managed it.
8. Because the rent fixed is in excess of any fair estimate of value of the estate, based upon a proper management of it.
4. Because interest has been allowed upon estimated rents.
5 (called 7). Because the commissioner has not reduced the charge for the rent of 1866-’7 below that of other years, although that was the year when the fencing had to be repaired, and there was no capital to buy stock, and the tenancy began and ended at an unseasonable period for farming operations, to wit, the 2d of May 1866 to 2d May 1867.
6 (called 8). Because the commissioner failed to allow Bolling sufficient credit for his improvements and repairs, over and above the general improvement of the land. See exception 8, of 17th December 1873.
And on the same day, to wit, the 23d day of December 1873, the cause coming on to be further heard on the papers formerly read, the commissioner’s report last mentioned, and the defendant’s exceptions thereto, was argued by counsel. On consideration whereof, the court, overruling the said exceptions and confirming the said report, decreed that the defendant, Bolling, should execute and deliver to the plaintiff, Lersner, a good and sufficient deed in fee simple, with general warranty, conveying to said plaintiff that tract or parcel of land known as Bollingbrook, in the bill and proceedings mentioned; and further decreed that the plaintiff should recover against the defendant the sum of $5,262.43, with interest on $4,684.19, part thereof, from the 20th of December 1873, and the costs by *60 him expended in the prosecution of this suit. And leave was reserved to the plaintiff to apply for further relief on the footing of the said decree.
From that decree an appeal to this court was applied for; which was accordingly allowed.
We have disposed of all the questions arising on this appeal except those which relate to the account taken of rents and profits, and they are presented by the six exceptions of the appellant to the last report of the commissioner, all of which were overruled by the decree appealed from. W e will now proceed to consider them, though not, perhaps, in the precise order of the exceptions.
It is well settled, and not denied in this case, that when a contract is made for the sale of real estate, which a court of equity will specifically execute, from the moment of the contract the estate is to be considered as the property of the purchaser, and the purchase money as the property of the vendor; possession of the former to be delivered, and payment of the latter to be made, according to the terms of the contract. If, wrongfully, such possession be retained by the vendor, or such payment be withheld by the vendee, contrary to the terms of the contract, the obligation hence arises to pay rents and profits in the one case, or interest in the other, as the case may be. In this case no question arises in regard to the obligation to pay interest, the purchase money and interest having been all paid. But there is a question, which is the main, and, in substance and effect, almost the only remaining question in the case, in regard to the obligation to pay rents and profits. The vendor has continually retained possession of the estate, “from the 2d May 1866, when possession thereof ought to have been delivered under the terms of the contract,” *61 as adjudged by the decree of the special Court of Appeals, and yet retains such possession. His obligation to account for and pay rents and profits to some extent, supposing the contract to be valid and binding, as it has been adjudged to be, is not denied. The only question is as to the extent of such liability and the rule by which it is to be ascertained. The appellant contends that he is bound to account for and pay only the amount of actual profits realized by him; while the appellee contends that the obligation is to pay “the annual value of said lands in the hands of a prudent and discreet tenant, upon a judicious system of husbandry,” “ the mode of treatment by the occupant” having “some influence in determining this value,” according to the decree of the Circuit court of the 20th of December 1878.
"We are of opinion that the latter is the just and true measure of the appellant’s liability and the mode of ascertaining it, and therefore that the Circuit court did not err in applying such measure and mode to this case, and in decreeing “ that the amount allowed by said commissioner (to wit: nineteen hundred and twenty-five dollars per annum) is more than a fair rent under the circumstances, “and in ascertaining such rent, upon a fair view of the testimony, to be the sum of fifteen hundred dollars per annum.” At all events, we think the appellant has no just cause to complain of the amount of this assessment. There may be, and no doubt are, cases in which the amount of profits actually received, without regard to the actual yearly value of the property, is the just aüd true measure of liability. If a person were in possession of land which he bona fide believed to be his, and did not know was claimed by another, who might be adjudged to be entitled to it, there would seem to be reason in charging *62 such person only with such profits as he actually received. But here the case is altogether different. A - controversy arose between the parties very soon after the war about their contract, and as early as October 1865 this suit was brought by Lersner for its specific execution. He claimed in his bill to have fully paid the purchase money, and to be entitled to the possession of the land, which he said was wrongfully withheld from him. Bolling in his answer denied that Lersner was entitled to a specific execution of the contract, and claimed a rescission thereof for reasons set forth by him. The litigation between the parties thus commenced in 1865, was actually prosecuted by them until the 13th of September 1867, when a decree was rendered by the Circuit court annulling the contract, and for the payment by Bolling to Lersner of the sum of 119,708.90, with interest as therein mentioned, subject, however, to the provisions of the act of assembly staying the collection of debts, and also for the payment of the costs of suit by Lersner to Bolling. From the said decree an appeal was applied for on the 16th of April 1869, allowed May 17th 1869, and perfected by the execution of an appeal bond on the 11th of November 1869. This appeal was prosecuted without intermission until the 27th of January 1873, when the special Court of Appeals being of opinion that there was error in the said decree of the Circuit court in rescinding the contract of the 19th of January 1863, and in not decreeing the specific execution thereof, therefore reversed the said decree with costs, and remanded the cause to the Circuit court, with instructions to refer it to a commissioner to take certain accounts, and among them an account charging Bolling “ with the rents and profits of Bollingbrook, and Ben Lomond from the 2d day of May 1866, when possession thereof *63 ought to have been delivered under the terms of the contract.”
blow how can it be said, under all these circumstances, that Bolling is not chargeable with a fair and reasonable rent for the property from and after the 2d day of May 1866, when, according to the decree of the special Court of Appeals, he ought to have delivered possession to Lersner under the terms of the contract? The fact is, that when we say that the decree of the special Court of Appeals is valid and conclusive, we decide every question of controversy in this case, even that which relates to rents and profits. In that view of the case it stands thus: On the 2d day of May 1866 Bolling was in possession of the land in controversy, and was bound by his contract to deliver it to Lersner, who had paid the whole amount of the purchase money, and was then demanding such possession, and actively prosecuting this suit for its recovery. Bolling has ever since remained, and yet remains, in the full possession and enjoyment of the land, while Lersner has ever since been demanding, and actively prosecuting this suit to recover such possession, with the exception only of about two years, during which his application for an appeal from the decree of the Circuit court of the 18th day of September 1867 was suspended; and even during that period it must have been confidently expected by Bolling that Lersner intended to apply for an appeal, and that if he so applied he would obtain it.
Under these circumstances ought not Bolling to have expected and prepared to pay a reasonable rent for the land in case of its recovery from him? And now that a decree has been rendered against him for it by the court of last resort, is there any principal of law or equity which can exempt him from liability for *64 such a rent? We think not. And then the question is, what is a reasonable rent in such a case?
The commissioner ascertained that an average of the estimates of all the witnesses on both sides, of which there was an equal number, made the sum of nineteen hundred and twenty-five dollars, and reported that as a reasonable annual rent. But Bolling excepted, and the Circuit court sustained his exception, and reduced the sum to fifteen hundred dollars per annum, which it considered to be a reasonable rent under all the circumstances of the case, and especially looking to the care which had been taken of the land, and of the prudent manner in which it had been managed and cultivated. And from that amount of fifteen hundred dollars was deducted every cent which had been paid by Bolling for taxes on the land, for ditching, fencing, and other improvements, with the single exception of clover seed and plaster used upon the land, which was. considered to be properly chargeable to the tenant, and not to the owner of the land. Is this more than a reasonable rent? and has Bolling any just cause to complain of it? We think not.
And this disposes of all the questions arising upon the exceptions to the commissioner’s last report, except the fourth, “because interest has been allowed upon estimated rents,” which presents the only remaining question to be decided in the case.
In actions for the recovery of rent in arrear, it was a general rule formerly, that interest was not recoverable on the sum due, because the landlord had a summary remedy by distress. 1 Rob. Pr., old ed. 362-8, and cases cited. But although interest was not given, of course it might, nevertheless, be given under circumstances to be judged of by the jury; and in case of a general verdict allowing interest, it was intended *65 that sufficient circumstances existed to justify an allowance thereof. Id. But this rule has been changed by an act passed March 2d, 1827, which provides “that interest shall hereafter be allowed on rent in arrear from the period or periods at which the whole or any portion thereof shall become due.” Id. Acts of 1826-’7, p. 26, ch. 27, § 3. Since the passage of this act, there seems to be no difference between debts due for rent, and debts due for any other valuable consideration; as there certainly should not be. In the Code, p. 969, ch. 134, § 7, the words of the law are: “ In any action for rent, or for such use and occupation, interest shall be allowed as on other contracts.” We know that in the United States the law favors the recovery of interest more than in England; and as a general rule here, where a debt is due, it will bear interest, which is an incident of the debt, and follows it as shadow does the substance. That rent is what is called “estimated,” can make no reasonable difference. Rent must be estimated where the precise amount has not been fixed by agreement. But why may it not be estimated as the value of any other, consideration may? See Eppe’s ex’or v. Cole Sp wife, 4 Hen. and Mun. 161, and Sutton v. Mandeville, 1 Munf. 407. The statute expressly provides, that a landlord may by action recover “a reasonable satisfaction for the use and occupation of lands;” and the same section of the statute provides, as above mentioned, that in any such action “interest shall be allowed as on other contracts.” In this case, a large portion of the rents was applied as they accrued to the payment of what was due to Bolling on account of the bills endorsed by him, and thus stopped interest. Of course there can be no objection to that, nor can there be any objection, in reason or *66 justice, to an allowance of interest on the rents which afterwards accrued and remained in arrear.
Upon the whole, we are of opinion that there is no error in the decree appealed from, and that it ought to be affirmed.
Decree affirmed.