ROY GENE CARPER

*v.*

KANAWHA BANKING & TRUST COMPANY, *a corporation*

*and*

FAIRMONT MOBILE HOMES, INC., *a corporation*

(No. 13074)

Submitted September 12, 1972. Decided February 5, 1974.

Concurring Opinion July 30, 1974.

478

480

*Spilman, Thomas, Battle & Klostermeyer, Frederick L. Thomas, Jr., Thornhill, Kennedy & Vaughan, W. A. Thornhill, III,* for appellants.

*Bowers, File, Hodson & Payne, James M. Henderson, II, Donald D. Hodson* for appellee.

HADEN, JUSTICE:

This is an appeal by Fairmont Mobile Homes, Inc., a corporation, and Kanawha Banking & Trust Company, a corporation, from a jury verdict and an adverse judgment rendered by the Circuit Court of Raleigh County, in the amount of $2,500.00 against Fairmont, and $2,500.00 against Bank. After the jury had been discharged the trial court also amended the judgment order and avoided all interest or finance charges said to be due the Bank and Fairmont under the terms of a conditional sales contract. This instrument provides a documentary foundation for most of the evidentiary and legal matters involved in this appeal.

The judgment favoring Carper resulted from the jury trial of a civil action brought by Carper in which he alleged violation of the usury laws by Fairmont and the Bank in a commercial transaction through which Carper had purchased a mobile home from Fairmont and then financed it with Fairmont and the Bank, an assignee of the subject conditional sales contract.

Factually, this transaction began in the summer of 1968. Roy Gene Carper, in anticipation of marriage and establishing a separate home for himself and his affianced, shopped several places for a mobile home. On July 22, 1968, Roy Gene Carper, accompanied by his finance, apparently settled on a mobile home offered for sale by the defendant, Fairmont. This mobile home was described as a Frontier Model, with certain special modifications which were to be manufactured to Carper's order through Fairmont to the basic manufacturer. It appears by a receipt issued to Carper by Fairmont's agent Ball, that, on this date, Carper paid Fairmont a $1,000.00 down payment and ordered a mobile home which he understood was to cost him $6,000.00 plus $180.00 consumer sales tax. Thereafter, Fairmont, upon the execution of a "bill of sale" and upon the receipt of the $1,000.00, as well as upon the partial execution of the conditional sales contract form evidencing the sale and the credit transaction,

ordered the mobile home from the basic manufacturer with a delivery date six weeks to two months hence. From this point in time forward, the method and terms of payment as well as the ultimate purchase price of the mobile home were matters in dispute and all were submitted to the jury by the court below.

It appears from uncontradicted testimony that the Bank first became involved in the transaction on August 2 or 3, 1968 and, on August 14, 1968, it agreed conditionally to finance the credit transaction. The contract, payable in installments at the "Kanawha Banking and Trust Co.", was completed and fully executed on September 28, 1968, and then assigned to the Bank under date of October 9, 1968.

According to Fairmont and the Bank, Carper, not having other sources of credit available to him, was offered the mobile home at a cash price of $6,180.00, including tax, or at a credit price of $9,144.00, payable in equal monthly installments of $95.25 for eight years. Fairmont alleges these figures were communicated to Carper upon the partial completion of the papers on July 22, 1968. The appellants say that Carper accepted the terms of the credit sale and agreed that Fairmont should arrange the financing with Kanawha Banking & Trust Company, a lending organization which liked to help young people. The evidence showed that the Bank was one of several institutions with whom Fairmont had previously conducted similar business. According to Fairmont's agent Ball, all the papers signed by Carper were completed on July 22, 1968, with the notable exception that the effective date of the conditional sales contract was not added until September 28, 1968, three days before the delivery of the subject mobile home. This was done, according to Ball, so that Carper would not be liable for payments on the loan until he had accepted delivery of the mobile home which he had ordered. Further, as demonstrated by other instruments, Fairmont used the time period to secure a credit report on

Carper and to obtain the Bank's agreement to finance the transaction.

According to Carper's version, he made a bargain to buy the mobile home for $6,180.00, including tax, on the basis of paying $1,000.00 cash at the time the bargain was made, and with a further agreement with Fairmont to finance the balance due of $5,180.00 on a contract, the terms of which would result in ninety-six equal payments of $95.25 per month for a period of eight years. Upon inquiry as to the interest rate, Carper was told by Ball who filled out the papers that the interest rate would be six and one-half percent, and that it would be computed upon the balance due of $5,180.00, plus a figure of $835.60 for property and credit life insurance premiums which aggregated a total of $6,015.60 to be paid by Carper. The conditional sales contract explicitly carries on its face a total amount due of $9,144.00, a figure which Carper and his wife Barbara deny was communicated to them. Carper's factual contention was that he had not agreed to pay more than six and one-half percent interest on the amount to be financed.

The conditional sales contract reflects that the difference between the remaining cash balance due of $6,015.60 and the $9,144.00, characterized as "the total time balance due," was a figure of $3,128.40, characterized by the contract as "finance charge." From the testimony of Fairmont and the Bank, the finance charge was computed by applying six and one-half percent "add-on interest" to the balance of $6,015.60. In terms comprehended by this Court, "add-on interest" means that the figure six and one-half percent is multiplied by eight years, the life of the contract, thereby equalling a percentage rate of fifty-two percent to be applied to the total to be financed, $6,015.60. This figure, according to actual computation, amounts to $3,128.11. According to Fairmont's computation, the figure was rounded off to $3,128.40, or a difference of twenty-nine cents (.29). The interest rate of fifty-two percent, of course, does not

represent an annual rate. According to the testimony of the parties, the rate of fifty-two percent over the eight-year life of the contract is equivalent to a simple annual interest rate of approximately thirteen percent. Actual computation reveals an effective simple interest rate of eleven and twenty-three hundredths percent (11.23%).

For purposes of illustration, this Court has prepared a statement which reflects the cost of the mobile home to Carper under the financing arrangement as set forth in the conditional sales contract. This instrument also reflects how the costs were computed. It appears as follows:

### BUYER'S MOBILE HOME COSTS:

| | |
|---|---:|
| Selling price | $ 6,000.00 |
| 3% West Virginia sales tax | +180.00 |
| Total | 6,180.00 |
| Less down payment | —1,000.00 |
| Unpaid balance | 5,180.00 |
| Insurance premiums | +835.60 |
| Total to be financed | 6,015.60 |
| Finance charge (*computed at 6-1/2% add-on interest rate) | +3,128.40 |
| Total time balance due | $ 9,144.00 |

Number of payments 96 at $95.25
Total required to satisfy sale and "Financing" for eight years _____ $10,144.00

\*6-1/2% add-on interest computed as follows:
  6.5%
  ×8   years: Life of contract
  _____
  52% : Total interest for eight years
        or
11.23% : Equivalent annual simple interest

After the final execution of the conditional sales contract on which reflected a first payment due on November 10, 1968, and in installments payable to Kanawha Banking & Trust Company, Charleston, West Virginia, the mobile home was delivered to Carper and accepted by him on October 1, 1968.

Sometime before the November payment was due, the Bank sent a loan passbook to Roy Gene Carper stating the amount of the debt due being $9,144.00 and reciting the terms of payment and length of loan. In addition, the loan passbook or accompanying paper apportioned the finance charge of $3,128.40 and identified $2,406.24 as being interest prospectively due to the Bank, and $722.16 as being interest prospectively due to Fairmont. Subsequent testimony elicited from the Bank demonstrated that the Bank's share of the add-on figure was five percent and Fairmont's share was to be one and one-half percent. Testimony of the Bank's officer Craig was that the finance charge calculated at the six and one-half add-on rate, was, if considered to be interest, in excess of the interest rate permitted by law.

Other papers admitted into evidence demonstrate that a credit life insurance policy insuring Carper's life was purchased in the stated amount of $5,445.00 and a physical damage insurance policy covering the actual cash value of the mobile home on September 28, 1968 was purchased from a separate company in the value of $6,200.00.

Carper made timely payments of the monthly amounts required by the conditional sales contract to the Bank up to and including the time this civil action was instituted on May 26, 1969. The testimony indicates that during the period from November of 1968 to the latter part of May 1969, Carper had had difficulty with the quality of the mobile home and, in that it was not repaired to his satisfaction, consulted counsel to obtain satisfaction of his complaints against Fairmont and the Bank which culminated in the institution of this civil action.

Carper's complaint alleged that the conditional sales contract was "for the forbearance of money" and called

for "a greater rate of interest than is permitted by law," alleging both parties to have notice of that infirmity. It further alleged that the contract was "void as to all interest provided for . . . .", and identified the interest as $3,128.40. The complaint further alleged that Carper was entitled to recover from each of the defendants "four times the amount of all interest agreed to be paid, or the sum of $12,513.60." The demand for judgment was in the above cited amount, interest and costs. The complaint was framed pursuant to West Virginia Code, Chapter 47, Article 6, Section 6, as amended, and reenacted effective September 14, 1968.

As has been noted, Carper placed his order for the mobile home, made a $1,000.00 down payment and partially executed the conditional sales contract sued upon on July 22, 1968. The conditional sales contract was made effective on September 28, 1968, and the delivery of the mobile home was accomplished on October 1, 1968. The assignment of the conditional sales contract from Fairmont to the Bank was shown to have occurred on October 29, 1968. Clearly then, the applicability of the usury statute, *Code* 1931, 47-6-6, *supra,* as amended effective September 14, 1968, was material to the validity of the cause of action, the relief sought, and the outcome of the case as reflected in the final judgment order appealed from.

Prior to September 14, 1968, the statute generally provided that a person injured by a usurious transaction could avoid that portion of the interest in the contract determined to be usurious. Subsequent to the *Code* amendment, the relief was substantially broadened and a person damaged by usury prohibited by the statute could avoid paying the entire amount of the interest charged in a usurious transaction, and not merely the excess over and above the lawful rate. In addition, the complainant could recover from the original creditor or lender who was other than a holder in due course, an amount of not less than one hundred dollars nor more than four times the total of

the usurious interest as a penalty. *Code* 1931, 47-7-6, as amended.

Resolving all disputed factual issues at the trial in favor of the plaintiff Carper, the jury necessarily found the contract assailed to have been effective after September 14, 1968 and in violation of the prohibition contained in the statute against the exaction of usury, an interest rate exceeding eight percent annual interest. The verdict in favor of Carper was in the following words:

> "May 21, 1970
>
> "We the Jury find for the Plaintiff Roy Gene Carper and against Fairmont Mobile Homes Sales Inc. and Kanawha Banking and Trust and Mr. Carper to recover in the amount of $2,500 from Fairmont Mobile Homes Sales Inc. and $2,500 from Kanawha Banking and Trust Co."

The court discharged the jury and entered judgment on the jury verdict on the same date.

On September 10, 1970, after consideration of motions to set aside the jury verdict and enter judgment in favor of the defendants, the court modified the jury verdict and awarded judgment in pertinent part as follows:

> "It is, therefore, ADJUDGED AND ORDERED that the interest charged on the contract in question as shown in the evidence, in the amount of $3,128.40, is void, and it is further ADJUDGED AND ORDERED that the plaintiff do recover of and from the defendant, Kanawha Banking & Trust Company, a corporation, the sum of Twenty-five Hundred Dollars ($2500.00) and that the plaintiff do recover of and from the defendant Fairmont Mobile Homes, Inc., a corporation, the sum of Twenty-five Hundred Dollars ($2500.00), with interest thereon at the rate of six per cent (6%) from the aforesaid date until paid and his costs of action, including a Statutory Attorney's fee of $10.00, to which action of the Court the defendants' and each of them, specifically object and except on the ground that the Court is erroneously expanding the jury verdict."

On this appeal, Fairmont and the Bank believed there to have been numerous prejudicial errors occurring in the course of the trial below which require a reversal of the final judgment.

All parties agree that the basic issue to be resolved is whether the questioned commercial transaction and the conditional sales contract sued upon containing finance charges which, if interest, exceeded the lawful rate allowable by law in West Virginia, were subject to the usury laws of the State of West Virginia. Fairmont and the Bank strongly assert that the transaction in question was exempt *as a matter of law* from the usury statutes of the State of West Virginia as being a *bona fide* sale of personal property on time-price sale basis.

Alternatively, both appellants assert that if the transaction in question was subject to the usury laws, it occurred in point of time prior to the amendment of the statute effective September 14, 1968, and their liability, if any, arises under the provisions of the former statute and is limited to interest calculated in excess of lawful rates.

In addition, the Bank asserts its freedom from Liability under either statute because it claims to be a holder in due course of a negotiable instrument.

Further, assuming all three questions above will be answered adversely to them, Fairmont and the Bank have assigned numerous errors occurring at or before trial which they believe compel a reversal of the case and the award of a new trial to them. Those errors are briefly summarized as follows:

First, both appellants moved the court for a mistrial or dismissal of the case at the conclusion of Carper's opening statement to the jury on the basis that Carper's counsel had pleaded the transaction to be an unlawful forbearance but had opened with a statement that proof would be adduced to show an unlawful loan. Overruling the motion, the court permitted the plaintiff to proceed with his case.

On this appeal, the trial court's discretion is assailed as having been abused by its refusal to conclude the case at that juncture of trial.

Second, the court erred in its instructions to the jury by giving obviously conflicting instructions on the burden of proof necessary to sustain a charge of usury. Specifically, the court at the request of the plaintiff had instructed that usury could be proved by "a preponderance of the evidence," while also charging at the behest of the defendants, that the standard of proof required was higher, that is, "by a clear and satisfactory preponderance of the evidence." The appellants say further, as the law requires the proof of usury by the higher standard, the giving of inconsistent instructions is presumed prejudicial to the defense offered.

Third, the court abused its discretion in failing to submit special interrogatories requested by appellants to the jury, and to require the jury's answer of them before arriving at a general verdict, in violation of *Code* 1931, 47-6-7, as amended.

Fourth, the jury verdict was erroneous and these errors were compounded by the court's subsequent action after discharge of the jury in interpreting the verdict and expanding it to include a finding that all interest under the assailed conditional sales contract was void. Further, in respect to this error assigned, Fairmont and the Bank say that the relief granted in the final order avoiding interest exceeds that demanded by the plaintiff in his complaint and is of a different character than that sought by the plaintiff.

Fifth, since the statute, *Code* 1931, 47-6-6, as amended, provides relief in the proper case in the disjunctive only, that is, either against the creditor or lender who is not a holder in due course, the jury verdict is erroneous as a matter of law in that it awarded a verdict in the conjunctive/disjunctive, that is, against each and both parties, thus effecting a prejudicial double recovery.

Sixth, Fairmont says the trial court erred in permitting Carper to read excerpts of a pretrial deposition of Craig, an officer of Bank, and permitting such evidence to be admissible in interest against Fairmont.

It is obvious from the foregoing that the issues in this case are many and complex. It is equally obvious that a discussion and resolution of the overriding issue will aid in the solution of the other legal problems presented on this appeal. This case concerns usury and a commercial transaction which is claimed to be outside the purview, or exempt from, the strictures of the usury laws. It is this problem which must be initially addressed.

Usury is the exaction of a greater sum for the use of money than the highest rate of interest allowed by law. *Evans v. National Bank,* 251 U.S. 108 (1919); *Hogg v. Ruffner,* 66 U.S. (1 Black) 115 (1861). See, Restatement, *Contracts* § 526 (1932). It was not prohibited at common law and rests entirely upon statutory prohibition or regulation. The first usury statutes of England, which were remarkably similar to their modern counterparts, were enacted at a time when that nation began its rise as a merchantile empire. See, 12 Anne, Stat. 2, c. 16 (1713). Such acts were a parliamentary response to the distaste for excessive exactions of interest, which itself had been contractually enforceable only for a little over a century. 37 Henry VIII c. 9 (1545). See 45 Am. Jur. 2d, *Interest and Usury* § 3 (1969).

Similar statutes were enacted in our Mother State of Virginia early in the Commonwealth's history. Likewise, prohibitions against usury have been an integral part of the public policy and statutory law of this State since its proclamation. See, Acts of the Virginia Assembly, ch. 16 (1796); Code of Virginia, ch. 141 (1860); Code of West Virginia, ch. 96 (1868); *Davis v. Demming,* 12 W.Va. 246, 257 (1877).

In this case we are concerned with the most modern renditions of the usury statute. Prior to September 14, 1968, the governing statute provided:

"All contracts and assurances made directly or indirectly for the loan or forbearance of money or other thing at a greater rate of interest than six per cent, except where such greater rate is specially allowed by law, shall be void as to any excess of interest agreed to be paid above that rate, and no further except where otherwise specially provided by law."

On and after September 14, 1968, the statute in question provides:

"All contracts and assurances made directly or indirectly for the loan or forbearance of money or other thing at a greater rate of interest than is permitted by law shall be void as to all interest provided for in any such contract or assurance, and the borrower or debtor may, in addition, recover from the original lender or creditor or other holder not in due course an amount equal to four times all interest agreed to be paid and in any event a minimum of one hundred dollars. Every usurious contract and assurance shall be presumed to have been wilfully made by the lender or creditor, but a bona fide error, innocently made, which causes such contract or assurance to be usurious shall not constitute a violation of this section if the lender or creditor shall rectify the error within fifteen days after receiving notice thereof."

It is also relevant to the question of "add-on" interest though not controlling to the outcome of this case that, effective March 6, 1969, Section 5a, Chapter 47, Article 6 was added to the *Code*. This section permits interest charges on installment loans to be valid and not violative of the usury statute so long as the same do not exceed in interest charges the rate of six percent add-on interest. We note again for later discussion, the finance charges in the assailed conditional sales contract were calculated at the rate of six and one-half percent add-on interest.

In both historical and contemporary usuary statutes, one of the essential elements which must appear from a transaction said to be usurious is a loan or forbearance of

money. The generally accepted technical definitions, which distinguish between a loan and a forbearance, are to be found in 45 Am. Jur. 2d, *Interest and Usury* § 117 (1969):

"A 'loan' is an advancement of money or other personal property under a contract or stipulation, express or implied, whereby the person to whom the advancement is made binds himself to repay it at some future time, together with such other sum as may be agreed upon for the use of the money or thing advanced."

Forbearance, on the other hand, "signifies a contractural obligation of a lender or creditor to refrain during a given period of time from requiring a borrower or debtor to pay a loan or debt that is due and payable." *Id.* The definitions are meant to highlight the distinction between a loan and a forbearance: being that a loan is a contemporaneous transaction evidencing the creation of a debt to be repaid, while a forbearance is a subsequent agreement entered into between a debtor and creditor to secure the repayment of a debt previously created and matured.

It is asserted by Fairmont and the Bank that inasmuch as the instant transaction involves a *sale of property,* and since a sale of property is not a loan or forbearance of money, it is not within and subject to the strictures of the usury laws. This legal argument is well asserted, at least on an historical basis. Its genesis is a judicially-created rule, characterized by most as the "time-price doctrine," which has been traditionally called upon to justify the exemption of property sales from the requirements of usury laws. The doctrine seems to have had its origin as to sales of personal property in the 1774 case of *Floyer v. Edwards,* 1 Cowp. 112 (K.B. 1774). There the court distinguishing between interest charges on loans and higher prices for deferred payment of sales of gold and silver wire, held that a seller may offer such articles at two different prices, a cash price and a credit or time price. The rule came to be recognized that it was immaterial if the time price exceeded the cash price by

more than the statutory allowance for interest on a loan for the same duration. *Beete v. Bidgood,* 7 B. & C. 453, 108 Eng. Rep. 792 (K.B. 1827).

The foremost American statement of the rule came from the United States Supreme Court and is to be found in the case of *Hogg v. Ruffner,* 66 U.S. (1 Black) 115, 119 (1861). This case adopted the time-price doctrine in respect to credit sales of real property.

In this jurisdiction three early cases passed upon the same question and recognized and applied the doctrine to sales of real property. In *Reger v. O'Neal,* 33 W.Va. 159, 10 S.E. 375 (1889), the Court found no usury in a sales transaction which involved a charge for interest as a part of the time price which, although expressly denominated as interest, exceeded the amount of interest allowable by the usury statute for a loan transaction. Syllabus Point 2 expresses the rule:

> "A Note for the payment of a sum of money given *bona fide* for purchase-money for land, and not as a cover for a loan or forbearance of money, though it call for interest on that sum in excess of the rate allowed by law for the loan or forbearance of money, is not usurious. What is thus called 'interest' is as much a part of the purchase-price of the land as the principal sum, and the rate of interest so called for will be enforced."

The case of *Swayne v. Riddle,* 37 W.Va. 291, 16 S.E. 512 (1892), paraphrased the rule as follows:

> "To constitute usury there must be a borrowing and lending with intent to exact more interest than is allowed by law, or a forbearance in consideration of such interest being paid. But if what is called interest, or what is aimed at on the basis of a certain rate of interest, is in fact a part of the purchase-money or price of a tract of land sold, and not a mere cover for a loan or for the forbearance of money, it is not usurious, but is as really a part of the purchase-price for the land as is the principal sum."

Three years later, the case of *Crim v. Post,* 41 W.Va. 397, 23 S.E. 613 (1895) recognized the foregoing rules but there determined a transaction to be patently usurious where it was obvious that a lender had negotiated with the borrower new loans at usurious rates, including a bonus to the lender, to replace old notes at previous usurious rates. This transaction presumably involved both a usurious loan and a usurious forbearance. In that case the Court appended a significant *caveat* limiting the applicability of the time-price doctrine as previously enunciated in the *Reger* and *Swayne* cases, *supra,* and said in Syllabus Point 3:

> "But the statute contemplates that a search for usury shall not stop at the mere form of the bargains and contracts relative to such loan, but that all shifts and devices intended to cover a usurious loan or forbearance shall be pushed aside, and the transaction be dealt with as usury if it be such in fact."

Of utmost importance is that in both the C*rim* and *Swayne* cases, the Court recognized that whether a questioned transaction was usurious—or a *bona fide* sale of personal property saved by the time-price doctrine, was a determination "in fact."

All parties to this appeal, including the West Virginia Bankers Association and the West Virginia Retailers Association, *amicii* recognize that, since the *Crim* case, the time-price doctrine has not been questioned or construed by this Court until the present case. Our problem then is to reassess and evaluate the validity and applicability of the time-price doctrine *vis-a-vis* the usury statute to a modern commercial transaction exemplified by the conditional sales contract binding Carper, Fairmont and the Bank to the financing arrangement involved in the sale of a mobile home. Squarely, we must determine whether the time-price doctrine is a viable exception to the usury laws in a modern retail installment sales transaction involving consumer credit.

From the *Floyer, Beete, Hogg, Reger,* and *Swayne* cases there is derived a general rule for the credit sale of property. If the negotiation between the seller and the buyer involves a *bona fide* quotation of both a cash price and a credit price, the transaction does not involve usury, even though the quoted credit price is such as to exceed the cash price plus lawful interest thereon. This rule is generally recognized throughout the country. See Annotation, 14 A.L.R.3d 1065 *et seq.* (1967). It is also generally recognized that this rule may apply where the credit instrument, the sales contract, is assigned by the vendor to a lending institution and also where a note is given for the balance of the price. *Lundstrom v. Radio Corporation of America,* 17 Utah 2d 114, 405 P.2d 339, 14 A.L.R.3d 1058 (1965); Annot. *supra* 1065, 1091 § 7 and many cases cited therein. Fairmont and the Bank would have us stop there. They say that if a commercial transaction is couched in form within the requirements of the general rule, that is, if there appears on the face of the sales contract both a sales and a time price, that the transaction is *presumed in law* to be excepted from the application of the usury laws. This, of course, is the supporting basis for the appellants' motions for summary judgment, directed verdict, and for entry of judgment in their favor notwithstanding the jury verdict.

But, *quare*: Is every quotation by its mere recitation *ipso facto* to be accorded *bona fides*? For two reasons appearing in the law of the cases previously cited, we reject the contention that the time-price doctrine is a rule of law commanding the courts to ignore the usury statutes in the context of a credit sale of property. In each statement of the general rule, reference is made to the word *"bona fide"* and also to the words "in fact." Therein lies the germ for thought which results in the modern judicial resolution of commercial transactions claimed to be usurious. That this approach also has traditional and historical prestige is apparent from the language of the *Crim* case which holds that no shift or device nor mere form within the contract shall turn away a court or jury

from closely scrutinizing aspects of the contract which may be usurious. If a transaction is actually a device to evade usury laws, it is not saved by any attempted differential between a claimed "cash price" and a claimed "credit price." Thus, if the sale of personal property is really made on a cash estimate, and time is given to pay the price, and an amount is assumed to be paid greater than the cash price with legal interest, the transaction may be, in fact, usurious. *Moncure v. Dermott,* 13 Pet. (U.S.) 345, 10 L.Ed. 193 (1839); *First National Bank v. Daniel,* 239 F.2d 801 (5th Cir. 1956) (Ala.); *Daniel v. First National Bank,* 227 F.2d 353, *reh. den.* 228 F.2d 803 (5th Cir. 1955); *Hare v. General Contract Purchase Corp.,* 220 Ark. 601, 249 S.W.2d 973 (1952); *Ford v. Hancock,* 36 Ark. 248 (1880); *E. Tris Napier Co. v. Trawick,* 164 Ga. 781, 139 S.E. 552 (1927); *Dorothy v. Commonwealth Commercial Co.,* 278 Ill. 629, 116 N.E. 143 (1917); *Hillman's v. Em 'N Al's,* 345 Mich. 644, 77 N.W.2d. 96 (1956); *Bold v. Eustermann,* 216 Minn. 566, 13 N.W.2d 739, 152 A.L.R. 585 (1944); *Bass v. Patterson,* 68 Miss. 310, 8 So. 849 (1891); *Lloyd v. Gutgsell,* 175 Neb. 775, 124 N. W.2d 198, *reh. den.* 176 Neb. 354, 126 N.W.2d 224 (1963); *Morgan v. Schermerhorn,* 1 Paige (N.Y.) 544 (1829); *Osborne v. Fuller,* 92 S.C. 338, 75 S.E. 557 (1912).

In other words, within the contemplation of the parties contracting, if they deem or intend a sale of personal property to be based upon a cash price coupled with contemporaneous or subsequent arrangements to finance the balance of the sale, the terms of which provide for a total amount due greater than the cash price with legal interest, then the factual issue arises.

Consequently, we hold that whether a sale of personal property is *bona fide* and thus without the protections of the usury statute or part of a plan or device to evade the application of the usury law is a question of fact for the jury. *Swayne v. Riddle, supra; Crim v. Post, supra; Richeson v. Wood,* 158 Va. 269, 163 S.E. 339 (1932); *Lee v. Household Finance Corporation,* 263 A.2d 635 (D.C. C.A. 1970); Annotation 14 A.L.R.3d 1065, 1126 (1967).

When considering cases where usury is a factual question *vis-a-vis* the time-price doctrine, courts have come to recognize certain indicia to test for the presence or absence of usury in the context of the questioned commercial transaction.

First, on the rationale that a buyer must be presented with a realistic opportunity to choose between a cash and a credit price before becoming bound to a contract, the question of whether both prices were adequately and seasonably disclosed is a consideration for the trier of fact. *Universal C.I.T. Credit Corp. v. Hall,* 225 Ark. 78, 279 S.W.2d 281 (1955); *Hillman's v. Em 'N Al's, supra; General Motors Acceptance Corp. v. Mackrill,* 175 Neb. 631, 122 N.W.2d 742, *cert. dismd.* 377 U.S. 973, 12 L.Ed.2d 743, 84 S.Ct. 1657 (1963); *Wood v. Commonwealth Trailer Sales, Inc.,* 172 Neb. 494, 110 N.W.2d 87, *ovrld. on other grounds Dailey v. A. C. Nelson Co.,* 178 Neb. 881, 136 N.W. 2d 186 (1961).

Second, where the financing transaction is tripartite, the jury may examine the closeness of the relationship between the seller and the lender which may be demonstrated by the presence or absence of any of the following: (a) Sellers agreement with the buyer to finance the balance or arrange a loan; (b) Additional profit to a seller through dealer reserves; (c) Splitting of profit between the seller and lender from insurance premiums or other charges required of the buyer-borrower; and (d) Papers signed by buyer-borrower in blank. In the very recent case of *National Bank of Commerce of Seattle v. Thomsen,* 80 Wash. 2d 406, 495 P.2d 332 (1972), the court held, on facts very similar to the case before us, that where the vendor motor company had represented to the buyer that the bank would finance the transaction, and even though the representation might have been unauthorized, when the bank later accepted the contract, it ratified the vendor's action and vendor was, therefore, an agent in the transaction of a loan between the buyer-borrower and the bank. See, Comment, 48 Wash.L.Rev.

479 (1973). Accord, *Jackson v. Commercial Credit Corporation,* 90 Ga.App. 352, 83 S.E.2d 76, 79 (1954). For other agency or "close relationship" cases involving the seller's agreement to finance or obtain the financing, see Annotation, 14 A.L.R.3d 1056, 1137, 1140 (1967). All these cases involve incidents of shared benefits between vendor and lender at the additional expense of the buyer-borrower. Most also involve sequential completion of the contract—beginning with a bargain for a cash price and ending with a consumated "time-price"—coupled with an element of foreknowledge in the financing institution evidenced by its conditional approvals and final ratification of the vendor's representations to the buyer-borrower.

Third, when credit terms expressed to the buyer-borrower are couched and calculated in terms of "interest or percentage," a further indicia arises. *Bird Finance Corp. v. Lamerson,* 303 Mich. 422, 6 N.W.2d 732 (1942); *Torrey v. Grant,* 18 Miss. (10 Sm. & M.) 89 (1848); *Wood v. Commonwealth Trailer Sales, Inc., supra; Lloyd v. Gutgsell, supra.*

Fourth, when the contract binding the parties contains charges ambiguously designated as "time-price differential," "finance charge," "add-on rate" or the like, whose meanings are not readily apparent to any but the commercially sophisticated, this too is an indicia of a shift or device condemned by the courts. *Heidelberg Southern Sales Co. v. Tudor,* 229 Ark. 500, 316 S.W.2d 716 (1958); *Kyser v. I. M. Bragg & Sons,* 228 Ark. 578, 309 S.W.2d 737 (1957); *Universal C.I.T. Credit Corp. v. Hall, supra; Crisco v. Murdock Acceptance Corp.,* 222 Ark. 127, 258 S.W.2d 551, *cert. den.* 346 *U.S.* 910, 98 L.Ed. 407, 74 S.Ct. 239 (1953); *Beatty v. Franklin Investment Company,* 115 App. D.C. 311, 319 F.2d 712 (1963); *Wood v. Commonwealth Trailer Sales, Inc., supra; General Motors Acceptance Corp. v. Mackrill, supra; G.F.C. Corp. v. Williams,* 231 S.W.2d 565 (Tex.Civ. App. 1950).

In the trial of the case before the jury, Carper offered evidence which, though disputed, demonstrated in several significant particulars that the sale of the trailer and financing arrangements to pay for it was conducted in a manner to call for the application of the usury laws. The jury resolved all conflicts of fact in Carper's favor and we must accept the verdict unless it was manifestly wrong or unjust, or plainly not warranted by the evidence. This Court recently reaffirmed the principles which guide appellate courts in reviewing the soundness and correctness of jury verdicts. See *Weirton Savings & Loan Company v. Cortez*, 157 W.Va. 691, 203 S.E.2d 468 (1974). In Syllabus Point 6, we stated the rule as follows:

> "In an appeal by one who seeks reversal of a judgment entered on a jury verdict, the reviewing court is inhibited by the rule that not only must the evidence of the prevailing party be most favorably considered, but also, all conflicting testimony and all inferences that may be drawn therefrom must be resolved in favor of the prevailing party."

Accord, *Wager v. Sine*, 157 W.Va. 391, 201 S.E.2d 260 (1973); *Levine v. Peoples Broadcasting Corp.*, 149 W.Va. 256, 140 S.E.2d 438 (1965).

In the case below, the parties negotiated a bargain on July 22, 1968, in which Fairmont agreed to sell and Carper agreed to purchase a customized mobile home for a cash price of $6,000.00, upon the further understanding that Carper only had $1,000.00 down payment and that the balance would have to be financed. Fairmont agreed to finance the transaction by finding a bank which would lend the money to cover the balance. Fairmont suggested that Kanawha Banking & Trust Company would be the lending institution to handle the transaction and that the Bank would finance the balance at six and one-half percent interest. From the testimony offered by the Bank, its officer Craig agreed to finance the transaction in accordance with the terms communicated to it by Fairmont on or above August 14, 1968. The parties

concluded their agreement by the execution of a conditional sales contract effective September 28, 1968. In that Carper was told by Fairmont's agent Ball that he only had to pay six and one-half percent interest on the balance due while also being dissuaded from reading the partially completed papers and becoming aware of the total amounts due under the conditional sales contract by Ball telling him it wasn't necessary to read the papers and that Fairmont needed them only to order the mobile home, it therefore follows that a time-price was not communicated to Carper. Rather, it appears, and the jury must have so found, that the sale was conducted on a cash estimate basis. Additionally, as the parties spoke of the financing arrangement in the terms of *interest* and a *loan,* it is evident they treated the transaction as a sale of property coupled with a loan or forbearance to pay a debt to another debtor. Further, considering the negotiation intervals in the transaction from July 22 to September 14, to September 28 when the conditional sales contract was completed and the parties became bound, it is also apparent that the seller arranged the financing and, in the manner of doing so, acted as agent for the lending bank. This conclusion is further bolstered by the fact that the contract provided for the sharing of profits on the transaction in various forms between Fairmont and the Bank and that all these profits were "costs" to the buyer-borrower Carper which were additional charges and part of the cumulative total of the loan or forbearance transaction represented by the conditional sales contract.

Depending upon one's perspective of the entire transaction it may appear in one light either as a sale coupled with a loan, or as a sale coupled with a forbearance. The answer is that the historical distinction between loan and forbearance is obliterated in the tripartite financing arrangement employed in this case and commonly employed in the installment sales industry to finance consumer items.

From Carper's standpoint, he was obligated to pay the difference between his down payment and the cash price of the mobile home, plus tax, to Fairmont when the mobile home was delivered. Having communicated his inability to pay the difference in cash, he agreed to finance or borrow the difference from the banking source provided him by Fairmont, on the consideration of paying an additional $835.00 for insurance premiums and an additional six and one-half percent simple interest on the balance due.

Based upon Carper's obligation under the contract to pay a financed total of $9,144.00 for a $6,000.00 item of property, the Bank agreed to lend Fairmont $6,015.60 cash. Using this form of commercial transaction, the Bank: lessened its risk of lending money by sharing it with Fairmont; obtained security and insurance on the security and the loan; and realized more profit from the loan than the highest rates permitted by law.

From Fairmont's perspective, the financing arrangement which expanded the sales bargain from $6,000.00 plus tax to $10,144.00 total receipts, represented aspects of both a loan and a forbearance. The forbearance was to Carper; the loan arose in its dealings with the Bank. Fairmont, by agreeing to provide money to Carper to finance the balance, and by borrowing from the Bank on Carper's credit, received enough cash to pay the manufacturer, the freight, the tax commissioner, and still obtain an immediate profit of $721.86. Because of its further agreement with the Bank, it stood to gain twice its cash-price profit on the sale, share its risk of extending a forbearance to Carper and also gain additional profit from insurance premiums charged Carper to insure his life and the mobile home.

Again, to illustrate, the Court has prepared a summary of the possible payouts under the transaction: The first representing the disbursement proceeds if a true cash sale had occurred; the second representing a disbursement of proceeds under the "time-price sale.":

(1) *PAYOUT OF "CASH SALE" PRICE FOR $6,000.00 PLUS TAX*

TOTAL RECEIVED ............................ $ 6,180.00

PAYOUT:

| | |
|---|---|
| Manufacturer .................... | $ 4,961.35 |
| Freight ........................... | 316.79 |
| Tax Commissioner .............. | 180.00 |
| Fairmont ......................... | 721.86 |

TOTAL .................................. $ 6,180.00

\* \* \* \* \* \*

(2) *PAYOUT OF "TIME-PRICE SALE" OF $9,144.00 PLUS DOWN PAYMENT*

TOTAL RECEIVED ............................ $10,144.00

PAYOUT:

| | |
|---|---|
| Manufacturer .................... | $ 4,961.35 |
| Freight ........................... | 316.79 |
| Tax Commissioner .............. | 180.00 |
| *Life Insurance (8 year decreasing term) ........... | 435.60 |
| *Property Insurance (5 year policy) ............. | 400.00 |
| K. B. & T. ....................... | 2,406.24 |
| *Fairmont ........................ | 1,444.02 |

TOTAL ............................... $10,144.00

*Fairmont's takeout of $1,444.02 is *increased* by its commission on the sale of the two policies which will be approximately $135.00**, and subject to *decrease* by the retained reserve of $274.32. Of course, the reserve is subject to release to Fairmont on a proper payout by this customer.

**The commission to the sales agent usually equals one full year's premium. See, as to profits a vendor or lender may realize on the sale of insurance incident to a "credit" sale of property: Copenhaver, "The Uniform Consumer Credit Code," 71 W.Va. L. Rev. 15, 16 (1968).

From the foregoing it is quite obvious that Fairmont realizes far more in a sale of a mobile home coupled with a "financing" than it does on a straight cash sale. We conclude that something more than a mobile home was sold to Carper. He also bought insurance policies and the ability to extend his matured obligation to Fairmont over an eight-year period. Fairmont, under this arrangement, receives the best of both worlds. It has sold a mobile home, has gained an additional profit by acting as agent in the financing arrangement, and has obtained the immediate access to its normal cash sale profit.

From the Bank's standpoint it has obtained one additional loan, which is the life blood and essence of its business and, as recourse is a condition of the contract, it shares the risk of loss with its partner in the financing venture. Additionally, the Bank and Fairmont, by characterizing interest as "finance charges," would have realized 11.23 percent annual interest rate on money loaned and financed when the usury law applicable to the transaction permitted only an 8 percent charge.

The jury found this particular transaction to have been in violation of the usury law. As demonstrated by its award of damages, the jury further concluded that the conditional sales contract was completed subsequent to the effective date of the amendment of the usury statute. Believing these matters to have been triable factual issues for the jury, and based upon the evidence presented, we find no error in the jury determination and we agree with the trial court that the verdict finding of usury was amply supported by the evidence.

Additionally, from the law of contracts and from the evidence of this case it is apparent that the conditional sales contract sued upon became effective when it was completed and that the completion date was September 28, 1968. At that time all parties became bound—to sell the mobile home, to accept delivery of the mobile home, and to finance the forbearance or loan used to finance the

complete commercial transaction. Restatement, *Contracts*
§ 74 (1932).

The Bank asserts its freedom from all liability to
Carper on its claimed status as a holder in due course.
Additionally, the Bank claims the benefit of the change in
the usury statute effective September 14, 1968 as expressly
recognizing a holder in due course's liability to be
limited in respect to one who has been damaged by usury.
Specifically, the Bank refers to language in the statute
which provides for quadruple damages, as follows:

> ". . ., and the borrower or debtor may, in
> addition, recover from the original lender or
> creditor or *other holder not in due course* an
> amount equal to four times all interest agreed to
> be paid, and in any event a minimum of one
> hundred dollars." (Emphasis supplied.)

The Bank, we believe, correctly asserts that this
language effectively abrogates holdings of prior decisions
of this jurisdiction that usury laws are not affected by
the principles of negotiability. See *Hall v. Mortgage
Security Corporation of America,* 119 W.Va. 140, 192 S.E.
145 (1937) which held that the taint of usury will follow
notes into the hands of purchasers for value without actual
notice. Accord: *Artrip v. Peters,* 114 W.Va. 819, 174
S.E. 524 (1934); *Kessel v. Cohen,* 104 W.Va. 296, 140 S.E.
15 (1927); *Eskridge v. Thomas,* 79 W.Va. 322, 91 S.E. 7
(1916).

Nevertheless, we believe that assertion, correct though
it may be, begs the more basic question. Under the facts
of this case we must inquire, where is the negotiable in-
strument? Although there are passing references to a
note in the testimony and in stipulations permitting
certain documents to be introduced into evidence without
proof of custody, there nowhere appears in the record of
this case a negotiable instrument made by Carper payable
to Fairmont and endorsed or assigned to Bank. Con-
sequently, we are directed by necessity solely to the

conditional sales contract. It is not a negotiable instrument. There is no case in this jurisdiction which accords a conditional sales contract, in and of itself, the status of a negotiable instrument. Indications are obtained from decisions of other jurisdictions that a promissory note detachable from the form of a conditional sales contract, where the note "language" makes mere passing reference to the contract, is not thereby prevented of a claimed status of negotiability. See Annotation, 44 A.L.R.2d 8, 57 et seq. (1955). We do not pass on this point because it is irrelevant to this decision. Here, the only instrument available to demonstrate the bargain of the parties is the conditional sales contract containing both usurious charges and also conditions, either of which would effectively preclude any consideration of negotiability. One West Virginia case touched lightly upon the point involved here. In *Cotton States Mutual Insurance Company v. Bibbee,* 147 W.Va. 786, 131 S.E.2d 745 (1963), a pertinent distinction was drawn between the conditional sales contract law and the negotiable instruments law as follows:

"One deals with conditional sales of personal property and the other deals with negotiable instruments. The uniform conditional sales act relates to *non-negotiable instruments* and the uniform negotiable instruments act relates to the law merchant dealing with bills and notes which are negotiable instruments." (Emphasis supplied.) *Id.* at 792.

Further, under the Uniform Commercial Code, negotiability is always determined by what appears on the face of the instrument itself. See *Code* 1931, 46-3-105, as amended, Official Comment, and *Code* 1931, 46-3-119, as amended, Official Comment No. 5. See also, 11 Am. Jur. 2d, *Bills and Notes* § 72 (1963); Accord: *Fayette Building and Loan Association v. Crouch,* 115 W.Va. 651, 177 S.E. 532 (1934). One who holds a nonnegotiable instrument is not a holder in due course. This proposition, as it relates to the amended usury statute, was succinctly

summarized by Professor William O. Morris in his lead article "West Virginia Usury Law—Comments Upon The 1968 and 1969 Acts," 71 W.Va. L. Rev. 326 (1969), at 333:

"Under the language used in the act [*Code* 1931, 47-6-6, amended effective September 14, 1968] any purchaser of a nonnegotiable claim which is tainted with usury, even though he is an innocent purchaser and is unaware of the usury, is made liable to the borrower for the penal sum. This necessarily follows for such party is a creditor and cannot be a holder in due course since one can only occupy such status if he holds a negotiable instrument. The purchaser of a nonnegotiable instrument cannot be a holder in due course."

It is apparent that both Fairmont and the Bank had full notice of the provisions and charges contained on the face of the conditional sales contract and acted in accordance therewith. One need only refer to the loan passbook forwarded to the Carpers to ascertain the Bank's notice. In that passbook, the provisions of which have been previously summarized, the Bank characterized the finance charge of $3,128.40 as interest, and divided its prospective proceeds as follows: $2,406.24 as being interest due the Bank and $722.16 as being interest due to Fairmont. The total interest figure, characterized by the conditional sales contract as finance charges, but characterized by the Bank as six and one-half percent add-on interest is an interest charge equivalent to 11.23 percent simple annual interest and is illegal as usury under either *Code* 1931, 47-6-6, as amended, or Section 5a of the same article effective March 6, 1969 (*Code* 1931, 47-6-5a, as amended). In summary, the Bank, at either the pleading stage, any juncture of the trial, or at the conclusion of all the evidence, could not successfully assert its status as a holder in due course as a matter of law.

An alleged trial error raised by motion for a mistrial or dismissal by Fairmont and Bank at the conclusion of Carper's opening statement to the jury and prior to the

introduction of the evidence, was that Carper characterized his cause of action as a usurious loan in oral statement, whereas in his pleadings he had characterized the transaction as a usurious forbearance. The trial court overruled the motion and permitted the plaintiff to proceed to introduce evidence. We apprehend no reversible error. A motion to dismiss the case of a party or to enter a directed verdict against a party based upon statements made by him in his opening to the jury is addressed to the sound discretion of the trial court. Dismissal or directed verdict at this stage of the trial should only be granted where the plaintiff, if given the opportunity to amend or explain, cannot recover under any circumstances. See *Alexander v. Jennings,* 150 W.Va. 629, 149 S.E.2d 213 (1966); *Oscanyan v. Arms Company,* 103 U.S. 261 (1880); Annotation, 5 A.L.R.3d 1405, 1411 (1966).

The *Alexander* case, *supra,* illustrates a factual situation in which the trial court was correct in taking the case from the jury at the conclusion of plaintiff's opening statement. Judge Haymond, speaking for the Court, acknowledged that although the rules provided for a dismissal or a directed verdict under the proper circumstances and that the same was directed to the sound discretion of the trial court, that such should be exercised with great care and with extreme caution:

> "However, in order to justify a judgment or directed verdict for defendant, plaintiff's opening statement must clearly show the absence of a right to recover; .... Thus in order to justify the entry of a judgment against a party on his opening statement, the admissions therein should be distinct and such as absolutely preclude a recovery; in other words counsel must clearly ruin his own case . . . ." *Id.* at 633-34.

Under the allegations of this case, and considering the cause of action provided by the statute, we believe and hold the trial court to have been correct in refusing to dismiss the case at the conclusion of plaintiff's opening

statement. To have dismissed the case would have served no useful purpose since the plaintiff, pursuant to *Rule* 15, W.Va. R.C.P., could have amended to preserve his cause of action. It also appears that no statute of limitation would have prevented a new trial on a new complaint covering the same facts and cause of action.

Another error allegedly occurring in the trial to the prejudice of Fairmont and the Bank was the court's action in adopting conflicting instructions proffered by Carper, the Bank and Fairmont, on the proper standard or quantum of proof required to sustain a charge of usury. At the request of Carper, the court charged the jury that usury under the facts of this case could be proved by "a preponderance of the evidence." However, at the request of the defendants Bank and Fairmont, the court also charged the jury that the burden was on the plaintiff Carper to prove the charge of usury by "a clear and satisfactory preponderance of the evidence." If Fairmont and the Bank were entitled to the charge requiring the higher standard of proof, these instructions are in obvious conflict and are presumed prejudicial to the appellants. *Quality Bedding Company v. American Credit Indemnity Company,* 150 W.Va. 352, 145 S.E.2d 468 (1965).

This Court is thus squarely confronted with the determination of the proper standard or quantum of proof required to sustain a charge of usury under the facts of this case. Authority on the proposition is meager and conflicting in this jurisdiction. In the case of *Swayne v. Riddle, supra,* this Court held at page 295:

> "The burden of proof is on the appellant, who alleges it, and he must make it beyond any ground for fair questioning. See *Brockenbrough v. Spindle,* 17 Gratt. 21."

The *Brockenbrough* case referred to as authority by our Court in *Swayne,* established a standard akin to that required in the proof of guilt in criminal cases, that is, beyond a reasonable doubt. The *Brockenbrough* case has since been rejected in the Commonwealth of Virginia, and

a lesser burden is now required of a plaintiff who seeks to prove usury in that jurisdiction. See *Evans v. Rice,* 96 Va. 50, 30 S.E. 463 (1898). There, the court held that usury must be proved by a "clear and satisfactory preponderance of the evidence." This is the rule contended for by the Bank and Fairmont in the instant case.

Other expressions of this Court in recognition or application of the rule would also seem to favor the standard of "by a clear and satisfactory preponderance of the evidence." See *Investors Loan Corporation v. Long,* 152 W.Va. 673, 679, 166 S.E.2d 113 (1969); *Kelley v. Lewis,* 4 W.Va. 456 (1871), Syllabus Point 3. Both of these cases recognize the "clear and satisfactory" standard. More pertinently, see *Vangilder v. Hoffman,* 22 W.Va. 1,13,15 (1883), expressly applying the "clear and satisfactory" standard.

A recent annotation on the precise subject of the standard of proof required in usury cases is to be found in 51 A.L.R.2d 1087 (1957). In that annotation, cases from every jurisdiction are collected and cited to illustrate that the degree of proof necessary to sustain usury ranges from a "mere inference" on the one extreme to "beyond a reasonable doubt" at the opposite extreme. We have reviewed the cases from other jurisdictions and the conflicting authority in this jurisdiction and we find it necessary to declare a further qualification to the diverse holdings on the subject.

Factually where a contract containing deferred payments on its face provides for charges which do not exceed lawful interest under the usury statute, there properly should be afforded a presumption of regularity to such instrument. Under those facts, the proof of usury by parole or otherwise to overcome the presumption of regularity of the contract should be strong; a clear and satisfactory preponderance of the evidence standard is certainly warranted.

That rationale does not obtain in the instant case. Here, the contract containing deferred payments demonstrates on its face that the finance charge added to the balance to be financed exceeds the legal rate of interest. Public policy is offended. This Court will always move to strike down patent usury and when doing so in the past, it has not found it necessary to travel beyond the boundaries of the instrument to gather proof. See, *Hall v. Mortgage Security Corporation, supra; Janes v. Felton,* 99 W.Va. 407, 129 S.E. 482 (1925). In *Heaberlin v. Jefferson Standard Life Insurance Company,* 114 W.Va. 198, 171 S.E. 419 (1933), the Court quoted approvingly from Mr. Justice Story's opinion in *United States Bank v. Waggener,* 34 U.S. (9 Pet.) 378 (1835):

> "Where, indeed, the contract upon its very face, imports usury, as by an express reservation of more than legal interest, the intent is apparent. There is no room for presumption." *Id.* at 203.

Returning to an initial premise of the case, all parties admit that the contract in question was legal only if this Court had recognized the time-price doctrine to be a valid exception as a *matter of law* to the usury statute. From the treatment of the main issue *supra,* it should be apparent that we do not choose to so sanctify the time-price doctrine, and but for the assertion of the doctrine, the contract sued upon in this case would have been patently usurious. In that the contract demonstrates what it contains and we and the trial court leave to the jury to determine whether, under the facts of the entire commercial transaction it was a *bona fide* sale of personal property protected by the limited confines of the time-price exception, or a usurious cover, there is no logical reason to require the plaintiff to prove his case by a higher standard than that required of civil litigants generally. For these reasons, we hold that a party who asserts usury based upon a contract which, on its face, contains charges added to the balance to be financed which exceed the lawful rate of interest, has the burden of proving his case by a preponderance of the evidence.

Accord: *Pease v. Taylor,* 88 Nev. 287, 496 P.2d 757 (1972);
*McCullough v. Snow,* 78 N.M. 544, 432 P.2d 811 (1967);
*Brocke v. Naseath,* 134 Cal. App. 2d 23, 285 P.2d 291, 51
A.L.R.2d 1083 (1955); 30 Am. Jur. 2d, *Evidence* § 1168
(1967); 45 Am. Jur. 2d, *Interest and Usury* § 352 (1969).

For the foregoing reasons, the rule of the *Quality
Bedding* case, *supra,* requiring reversal on conflicting
instructions is not applicable to this case. Such conflict as
occurred in the giving of the instructions is resolved here
by the statute ignoring harmless error. *Code* 1931, 58-1-2.
The Bank and Fairmont cannot show prejudice since this
Court only requires the lesser degree of proof on the
facts of this commercial transaction.

Fairmont and the Bank also assert alleged error in the
trial court's refusal to submit special interrogatories
proffered by them to the jury, and to direct that the jury
answer the questions before arriving at a general verdict.
The court's refusal is claimed to be a violation of the
provisions of *Code* 1931, 47-6-7, as amended. This section
provides that where a borrower or debtor is sued upon a
contract or assurance and pleads that the contract or
assurance is usurious, the court shall: ". . . direct a special
issue to try and ascertain:  (a) Whether or not the
contract, assurance or other writing is usurious; (b) if
usurious, to what extent; (c) whether or not interest has
been paid on such contract, assurance or other writing,
above the legal rate, and if so, to what extent; . . . ."

Appellants contend that they are entitled to inter-
rogatories under the implications of the statute; that if
the debtor is entitled to special interrogatories in such
actions, they, as creditors, are entitled to similar inter-
rogatories. We find no merit in this contention. The
action here litigated is an affirmative claim permitted the
debtor-buyer under another section of the statute.

The causes of action permitted under Section 7 of the
statute, and Section 6 of the statute, are separate, distinct
and of a different character. The requirements for trial

under Section 7 are not the requirements for trial under Section 6. Referring to the special and particular requirements of Section 7, this Court in *Harper v. Middlestates Loan, Etc., Association,* 55 W.Va. 149, 46 S.E. 817 (1904) and later in *Smiley v. Bank of Wyoming,* 104 W.Va. 471, 140 S.E. 330 (1927), held that the defense of usury was a personal defense of the debtor. We affirm that the procedures requiring special interrogatories are peculiar to a defendant who raises usury as a defense to an action brought by others on a contract or assurance, and we believe that the language of the two statutes is clear in its distinctions.

It is also to be noted that *Rule* 49 of the W.Va. R.C.P. on the subject of jury interrogatories and special verdicts, does not purport to change the substantive law on the submission of interrogatories to the jury. See Comment, LUGAR AND SILVERSTEIN, *West Virginia Rules,* page 366 (1960). In absence of statutory requirement, whether a jury shall be compelled to answer special interrogatories before arriving at a general verdict is a matter resting in the sound discretion of the trial court. 19 M. J., *Verdicts* § 23 (1952).

We do not believe there to have been any sound reason to further complicate the trial of this case by submitting questions which were, in effect, merely restatements of instructions given the jury. In any case, not required by statute, interrogatories should be used cautiously and only to clarify rather than to obfuscate the issues involved. Consonant with the prior decisions of this Court we find no error or plain abuse of discretion in the trial court's refusal to submit and direct answers to special interrogatories in this case. See *Payne v. Kinder,* 147 W.Va. 352, 127 S.E.2d 726 (1962); *Lovett v. Lisagor,* 100 W.Va. 154, 130 S.E. 125 (1925); *Spence v. Browning Motor Freight Lines, Inc.,* 138 W.Va. 748, 77 S.E.2d 806 (1953); *Daugherty v. Baltimore & Ohio Railroad Company,* 135 W.Va. 688, 64 S.E. 231 (1951); *Davis v. Pugh,* 133 W.Va.

569, 57 S.E.2d 9 (1949); *Bartlett v. Mitchell,* 113 W.Va. 465, 168 S.E. 662 (1933).

Two specific errors are assigned by Fairmont and the Bank in respect to the final judgment entered on the jury verdict in favor of Carper, and in respect to the finding of the jury as expressed in its verdict against both appellants.

First, upon consideration of the post-trial motions seeking a judgment contrary to the verdict found by the jury, or, in the alternative, the award of a new trial to the appellants, the trial court took unusual action. It modified and expanded the jury's verdict by its ruling that all interest provided for in the conditional sales contract as finance charges was void.

We must determine whether the final order was unwarranted as either an invasion of the province of the jury or as exceeding the relief demanded by the plaintiff in his complaint.

As an excess award, this contention is essentially one grounded in due process, that is, did the Bank and Fairmont have notice of that which they were defending, and of the extent of liability which could be found against them? From plaintiff's complaint, we believe the plaintiff Carper to have satisfied the requirements of *Rule* 8, W.Va. R.C.P. and the requirements of due process. In his complaint, he expressly alleged that the obligation of the conditional sales contract was "void as to all interest provided for. . . ." He further identified the questioned interest in specific figures as $3,128.40. The defendants, in their answers, denied the allegations of the complaint and they will be assumed by this Court to have realized the import of the allegation that the interest was void when comparing it with the plain language of the statute, *Code* 1931, 47-6-6, as amended.

It is to be also recognized that Carper sued for a money judgment in a total amount of $12,513.60. His recovery total awarded by the jury and expanded by the

court did not in any event exceed a total of $8,128.40. The sum of $3,128.40 (the avoided interest) of that total is a form of recovery which, under former procedures, would be characterized or expressed as a recoupment or setoff. One further rule of procedure persuades our thinking in regard to the final relief awarded to the plaintiff Carper. Specifically we refer to the requirements of *Rule* 13 of the Rules of Civil Procedure. Subsection (a) on *compulsory counterclaims* provides:

> "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. . . ."

It would appear that the requirements of this rule would have compelled the assertion of interest due under the contract by a seasonable counterclaim from Fairmont and the Bank in the trial below. Failure to assert a compulsory counterclaim is a waiver and abandonment of such a claim and an adverse decision to the putative claimant is *res judicata*. LUGAR AND SILVERSTEIN, *West Virginia Rules*, page 112 and Footnotes 3 and 4 contained therein.

The second aspect of the asserted error has far more serious overtones. In substance it asserts that the court invaded the province of the jury. We do not agree. The jury is to determine facts; the court must execute and apply the policy of the law. The controlling statute in this case provides expressly:

> "All contracts and assurances made directly or indirectly for the loan or forbearance of money or other thing at a greater rate of interest than is permited by law shall be void as to all interest provided for . . . ." *Code* 1931, 47-6-6, as amended.

It is our holding that when usury is proved the statute, *by operation of law*, avoids all the interest involved in the usurious instrument. The effective vehicle to

implement the operative provisions of this law is the court and not the jury. The trial court was correct in amending the jury verdict in the final judgment to avoid all interest under the usurious contract.

If the obverse legal situation had occurred, the trial court would have been compelled to add interest at the statutory rate to a judgment for a sum certain. The avoidance or allowance of interest in the proper case is the command of the statute a court must follow to protect the legal efficacy of its judgment. See, *Code* 1931, 56-6-31, which provides:

> "Every judgment or decree for the payment of money, except where it is otherwise provided by law, shall bear interest from the date thereof, whether it be so stated in the judgment or decree or not."

This Court has held that section to be mandatory, and where a trial court disregards it, it not only commits error but exceeds its legitimate powers. A final order which provided that a judgment for the payment of money should not bear interest was in violation of this section of the statute, and in that respect invalid. *Rakes v. Ferguson,* 147 W.Va. 660, 130 S.E.2d 102 (1963). By our lights, a special statute avoiding interest by operation of law shall receive the same sanctity as a general statute commanding that interest shall be added to a judgment.

The second error assigned in respect to the finding of the jury is that its verdict was fatally defective on its face. The jury awarded a penal sum of $2,500.00 against each of the appellants. The appellants refer this Court to the plain provisions of the statute which provides for a recovery of the penalty against "the original lender *or* creditor *or* other holder not in due course." (Emphasis supplied.) *Code* 1931, 47-6-6, as amended. It is their position that the statute was stated in a disjunctive in order to prevent a double recovery on the penalty provision.

Recognizing the obvious, the normal use of the disjunctive "or" in a statute connotes an alternative or option to select. The jury read the statute as permitting a recovery against the original creditor and the holder of the conditional sales contract. To have arrived at that conclusion they must necessarily have read into the statute the conjunction "and," the normal meaning of which is, that phrases or clauses or nouns it connects are to be considered jointly.

The general rule for statutory construction is that courts may only construe a statute to effectuate legislative intent, and a statute which is clear and unambiguous should be applied by the courts and not construed or interpreted. *State v. Elder,* 152 W. Va. 571, 165 S.E.2d 108 (1968).

On the other hand, courts have been frequently urged to read "and" as an "or" or vice versa, or to add one or the other to the statute. Because of inappropriate use of these words, their construction has become a necessity recognized in the rules of statutory interpretation:

> "The popular use of 'or' and 'and' is so loose, and so frequently inaccurate, that it has infected statutory enactments. For this reason, their strict meaning is more readily departed from than that of other words. In this respect it is clear that the courts have power to change and will change 'and' to 'or' and vice versa, whenever such conversion is required by the context, or is necessary to harmonize the provisions of a statute and give effect to all its provisions, or to save it from unconstitutionality, or, in general, to effectuate the obvious intention of the legislature." 50 AM. JUR., *Statutes* § 282 (1944) and cases cited therein. See also, 17 M.J., *Statutes* § 60 (1951) and *South East Public Service Corporation of Virginia v. Commonwealth ex rel. State Corporation Commission,* 165 Va. 116, 181 S.E. 448 (1935).

The usury statute was designed with the overall intention to prevent usury. Section 6, as amended, was

designed to give a person damaged by usury a cause of action and to allow him recovery from all persons benefiting from a usurious instrument who had notice of its usurious character. The recovery has two aspects. First, all interest in the contract found to be usurious is avoided as to its total amount and the person thus injured by usury is thereby saved from paying any interest. Second, there is a strong legislative command that usury is so contrary to the public policy of this State that those who knowingly accept the benefits of a usurious instrument are to be punished by an additional penal recovery which may be as much as four times the total interest due under the usurious contract, or as little as a minimum of one hundred dollars. The statute says that recovery may be had against the original lender or creditor or other holder not in due course. To give effect to the clear intention of the Legislature, it must be construed to permit a recovery against each and all, as the circumstances of illegal commercial transactions warrant. The statute only purports to forgive or exempt from its provision one who is a holder in due course, that is, one who has no notice of the usurious character of the instrument which he accepts. Clearly, the Legislature intended, in the proper case, to penalize all those who have notice that the borrower or debtor is being subjected to usury, and who thereafter accept benefits under the illegal instrument. We therefore hold that there was no error in this aspect of the jury verdict.

Finally, the appellant Fairmont contends the trial court erroneously permitted counsel for Carper to read from a portion of the deposition of Craig, a loan officer of the codefendant Bank. The substance of the testimony was an admission by Craig that the finance charge in the contract exceeded six percent add-on interest and that it would be obvious to most bankers that the charge exceeded the legal interest rate if the charge was regarded to be interest as such.

Fairmont concedes that while such a statement would be an admission against the interest of the Bank and

admissible as to it, it would not be admissible evidence against Fairmont, a coparty.

There is no previous West Virginia case on this point. However *Rule* 26 (d) (2) of the West Virginia Rules of Civil Procedure speaks to the problem:

> "The deposition of a party or of anyone who at the time of taking the deposition was an officer, director or managing agent of a public or private corporation or association which is a party may be used by an adverse party for any purpose."

In his commentary following this rule, Professor Lugar concludes generally that the rule permits the deposition of a party to be used for any purpose by an adverse party. LUGAR AND SILVERSTEIN, *West Virginia Rules*, Page 233 (1960). We would qualify that conclusion by noting that the deposition may be used by an adverse party against any party who had notice of the taking of the deposition and the consequent ability to respond or defend against the substance of the evidence elicited therein. See *Rules* 30 and 32 of the West Virginia Rules of Civil Procedure for the protections afforded parties in the taking of depositions. In the recent Federal Rules decision of *Riley v. Layton,* 329 F.2d 53 (10th Cir. 1964), consideration of a similar question to that raised herein was given by that court. That case involved the use in trial of the deposition against another codefendant by his codefendant in a medical malpractice action. The court in interpreting Federal Rule 26 (d) (2), identical in provision with the West Virginia Rule, said that the deposition could be used against a codefendant for any purpose. We believe the language of *Rule* 26 (d) (2) of the West Virginia Rules to be broad in scope and clear and unambiguous. The deposition of any party may be used by an adversary for any purpose. In that Fairmont and Bank are adversaries of Carper, and, insofar as the issue of usury is concerned, are joint parties, the lawfully taken deposition of an officer of the Bank was admissible by Carper against either of them or both of them. See: *Pursche v. Atlas Scraper & Engineering Co.,* 300 F.2d

467 (9th Cir. 1962); *Snowhite v. State,* 243 Md. 291, 221 A.2d 342 (1966). We find no error from this contention.

Believing, as we do, that our resolution of the main issue of this case was done in recognition of, and consistent with, subsisting law, we find no reason to consider the question of a prospective application of the rules of the case. See, *Great Northern Railway Company v. Sunburst Oil & Refining Company,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). The *bona fides* of a claimed time-price sale, otherwise violative of the usury laws, have always presented questions of fact when litigated. Misreliance on the form of a contract or upon the method of contracting, colorably protected by assertions of the time-price exception, provide no basis for relief in this Court.

If there is quarrel with the public policy involved in the usury statute *vis-a-vis* the realistic cost of money in today's market and the availability of highrisk consumer credit, these are questions which should be answered in legislative halls. The capacity of the judicial branch to appreciate the magnitude of these problems is not matched with the ability to enact remedial laws.

The judgment of the Circuit Court of Raleigh County is affirmed.

*Affirmed.*

SPROUSE, JUSTICE, concurring:

I concur with the majority opinion. There are assuredly areas in which a lender should be able to charge higher interest rates than would be desirable or permissible for a well-secured conventional loan. Flexible interest rates for the sale of goods would not only stimulate the economy, but would compensate the lender for higher risk and costlier loan administration. There are undoubtedly some circumstances involving real estate sales where higher interest rates for a loan or forbearance would be in the public interest. There are also other commercial

transactions in which a permissible range of interest rates rather than one fixed maximum rate would better serve the public policy of this State.

The "time-price" doctrine, however, in my opinion is a fiction created to serve this public policy. It is fallacious for the State to permit only an 8 percent interest charge when the borrower or buyer desires to repay the loan proceeds over a period of time, but to allow a higher interest rate when the lender utilizes the magic words indicating a present cash price, but a higher price if payment is to be made at a later date. Aside from the basic fiction, the weakness of the doctrine is that it permits each lender to determine the public policy questions of what additional charge a borrower should pay for various risks, loan administration difficulties, or other commercial problems. While lenders should have flexible interest rates for different type loans or forbearances, the welfare of lender, borrower and the public would be better served if the "time-price" doctrine were completely repudiated and permissible limits established by the legislature.

The majority opinion is scholarly, long, and many points are well presented. I feel, however, the statement of Syllabus Point 21, concerning interpretation of the use of the disjunctive and injunctive, is too broad. Moreover, I think there should be one uniform standard of evidence to prove usury whether the usurious charge appear from the face of the instrument or from the conduct of the parties. The standard should require a simple preponderance of the evidence. This would simplify the trial for the court and jury. Empirically, it is probably the tool used by juries regardless of court instructions simply because they have difficulty applying such technical distinctions. Finally, I would have applied the results of this decision prospectively.

Justice Berry, deeming himself disqualified, did not participate in the consideration or decision of this case.